## COMMONWEALTH *vs.* FREMONT INVESTMENT & LOAN & another.[1]

Suffolk. October 8, 2008. - December 9, 2008.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, CORDY, & BOTSFORD, JJ.[2]

*Practice, Civil,* Preliminary injunction, Consumer protection case. *Attorney General. Consumer Protection Act,* Unfair act or practice. *Massachusetts Predatory Home Loan Practices Act. Words,* "Unfair."

In a consumer protection enforcement action brought by the Commonwealth against an industrial bank (defendant), claiming that the defendant had violated G. L. c. 93A in originating and servicing certain "subprime" mortgage loans, the trial judge, in granting a preliminary injunction in favor of the Commonwealth that restricted the defendant's ability to foreclose on loans with features that the judge described as "presumptively unfair," did not apply new rules or standards for defining what was "unfair" in a retroactive or ex post facto fashion, where the defendant's actions, in originating loans with terms that would lead predictably to the consequence of the borrowers' default and foreclosure, were within established concepts of unfairness at the time the loans were made [742-748]; similarly, the defendant failed to demonstrate that the preliminary injunction created an environment of uncertainty that would result in unwillingness on the part of lenders to extend credit, where the injunction was based on established concepts of fairness and restricted, but did not remove, the defendant's ability to foreclose where those loan terms deemed unfair [751-752].

In a consumer protection enforcement action brought by the Commonwealth against an industrial bank (defendant), claiming that the defendant had violated G. L. c. 93A in originating and servicing certain "subprime" mortgage loans, the trial judge, in concluding that the Commonwealth was likely to prevail on the merits of its claim, appropriately applied the provisions of G. L. c. 183C, the Massachusetts Predatory Home Loan Practices Act, to the defendant's loans, where the conduct prohibited by that act was similar to the central element of the unfairness that judge found in the

---

[1]Fremont General Corporation. We are informed that this defendant filed a voluntary petition for bankruptcy on June 18, 2008, in California. Pursuant to 11 U.S.C. § 362(b)(4) (2000), that filing does not automatically stay the Commonwealth's present consumer protection action. See *In re First Alliance Mtge. Co.,* 263 B.R. 99, 107 (9th Cir. 2001). The defendant Fremont Investment & Loan represents that it is now known as Fremont Reorganizing Corporation. We shall refer to a single defendant (Fremont).

[2]Justice Greaney participated in the deliberation on this case prior to his retirement.

defendant's lending practices (namely, the origination of a home mortgage loan that the lender should have recognized at the outset the borrower was not likely to be able to repay) [748-749]; further, there was no merit to the defendant's claims that its actions were permitted by the law as its existed at the time it originated its loans and that the Commonwealth's action was therefore barred by G. L. c. 93A, § 3 [749-751].

CIVIL ACTION commenced in the Superior Court Department on October 4, 2007.

A motion for a preliminary injunction was heard by *Ralph D. Gants*, J.

After review was sought in the Appeals Court, the Supreme Judicial Court granted an application for direct appellate review.

*James R. Carroll* (*Peter Simshauser & Christian R. Jenner* with him) for Fremont Investment & Loan.

*Christopher K. Barry-Smith*, Assistant Attorney General, (*John M. Stephan*, Assistant Attorney General, & *Jean M. Healey*, Assistant Attorney General, with him) for the Commonwealth.

The following submitted briefs for amici curiae:

*Richard F. Hans & John P. Doherty* for American Securitization Forum & another.

*Jo Ann Shotwell Kaplan, Martin J. Newhouse, & John Pagliaro* for New England Legal Foundation & another.

*Stuart T. Rossman, Daniel Mosteller, Melissa Briggs, Matthew Brinegar, Jean Constantine-Davis, Nina F. Simon, Michael R. Schuster, Tara Twomey, & Ira Rheingold* for National Consumer Law Center & others.

*Paul Collier & Max Weinstein* for WilmerHale Legal Services Center of Harvard Law School.

*Robert B. Serino, Matthew P. Previn, & Kirk D. Jensen* for American Financial Services Association & others.

BOTSFORD, J. The Commonwealth, acting through the Attorney General, commenced this consumer protection enforcement action against the defendant Fremont Investment & Loan and its parent company, Fremont General Corporation (collectively, Fremont), claiming that Fremont, in originating and servicing

certain "subprime"[3] mortgage loans between 2004 and 2007 in Massachusetts, acted unfairly and deceptively in violation of G. L. c. 93A, § 2. Fremont appeals from a preliminary injunction granted by a judge in the Superior Court in favor of the Attorney General that restricts, but does not remove, Fremont's ability to foreclose on loans with features that the judge described as "presumptively unfair." All of the loans at issue are secured by mortgages on the borrowers' homes.

Based on the record before him, the judge concluded that the Attorney General had established a likelihood of success on the merits of her claim that in originating home mortgage loans with four characteristics that made it almost certain the borrower would not be able to make the necessary loan payments, leading to default and then foreclosure, Fremont had committed an unfair act or practice within the meaning of G. L. c. 93A, § 2. Fremont filed petitions for interlocutory relief pursuant to G. L. c. 231, § 118, first par., in the Appeals Court from the original preliminary injunction order and a subsequent order entered by the judge that modified the original preliminary injunction. A single justice of the Appeals Court declined to reverse either order and, at the request of Fremont, reported the matter to the Appeals Court. We granted the Commonwealth's application for direct appellate review.[4] We affirm the motion judge's grant of the preliminary injunction, as modified.

1. *Background.*[5] Fremont is an industrial bank chartered by

---

[3]"Subprime" loans are loans made to borrowers who generally would not qualify for traditional loans offered at the generally prevailing rate of interest for conventional mortgages. See text accompanying note 8, *infra.*

[4]Shortly after we granted the Commonwealth's application for direct appellate review, we solicited amicus briefs. We acknowledge the amicus briefs filed on behalf of Fremont by New England Legal Foundation and Associated Industries of Massachusetts; the American Securitization Forum and the Securities Industry and Financial Markets Association; and the American Financial Services Association, the Consumer Mortgage Coalition, the Housing Policy Council of the Financial Services Roundtable, and the Mortgage Bankers Association; and on behalf of the Commonwealth by WilmerHale Legal Services Center of Harvard Law School; and National Consumer Law Center, Center for Responsible Lending, AARP, National Association of Consumer Advocates, and National Association of Consumer Bankruptcy Attorneys.

[5]The factual information set out in this section is taken from the judge's

the State of California. Between January, 2004, and March, 2007, Fremont originated 14,578 loans to Massachusetts residents secured by mortgages on owner-occupied homes. Of the loans originated during that time period, roughly 3,000 remain active and roughly 2,500 continue to be owned or serviced by Fremont.[6] An estimated fifty to sixty per cent of Fremont's loans in Massachusetts were subprime.[7] Because subprime borrowers present a greater risk to the lender, the interest rate charged for a subprime loan is typically higher than the rate charged for conventional or prime mortgages.[8] After funding the loan, Fremont generally sold it on the secondary market, which largely insulated Fremont from losses arising from borrower default.[9] Fremont General Corporation, Annual Report (Form 10-K) 1, 6 (Mar. 6, 2006).

In originating loans, Fremont did not interact directly with

memorandum of decision concerning the preliminary injunction requested by the Attorney General, unless otherwise stated. Neither party appears to dispute the judge's factual findings, which were derived from the affidavits and other materials submitted in support of and in opposition to the motion for a preliminary injunction.

[6]As of July, 2007, Fremont owned and serviced approximately 290 loans in Massachusetts, and serviced but no longer owned approximately 2,200 other Massachusetts loans, all covered by the preliminary injunction.

[7]The judge made this estimate based on the fact that sixty-four per cent of all Fremont's loans were adjustable rate mortgage loans (ARM loans), and 38.4 per cent were "stated income" loans, in which the borrower provided no documentation of his or her income. The judge inferred, based on the limited record available at the preliminary injunction stage, that all of the stated income loans were subprime ARM loans, and a majority of the remaining ARM loans were also subprime.

[8]It is not clear that the higher interest rates on Fremont's loans were always appropriate. Federal agencies have warned that the subprime lending market creates incentives to inflate interest rates unnecessarily. Board of Governors of the Federal Reserve System, Federal Deposit Insurance Corporation, Office of the Comptroller of the Currency, Office of Thrift Supervision, Interagency Guidance on Subprime Lending at 5 (Mar. 1, 1999). In 51.4 per cent of Fremont's loans generally, and seventy-three per cent of a sample of delinquent Fremont loans analyzed by the Attorney General, Fremont paid a "yield spread premium" to the broker as compensation for placing the borrower into a higher interest rate bracket than the one for which he or she would otherwise qualify.

[9]Affidavits of former Fremont employees that are included in the preliminary injunction record support the view that Fremont's mortgage loan products and its underwriting policies were influenced by the interest of investors in purchasing the loans.

the borrowers; rather, mortgage brokers acting as independent contractors would help a borrower select a mortgage product, and communicate with a Fremont account executive to request a selected product and provide the borrower's loan application and credit report. If approved by Fremont's underwriting department, the loan would proceed to closing and the broker would receive a broker's fee.

Fremont's subprime loan products offered a number of different features to cater to borrowers with low income. A large majority of Fremont's subprime loans were adjustable rate mortgage (ARM) loans, which bore a fixed interest rate for the first two or three years, and then adjusted every six months to a considerably higher variable rate for the remaining period of what was generally a thirty-year loan.[10] Thus, borrowers' monthly mortgage payments would start out lower and then increase substantially after the introductory two-year or three-year period. To determine loan qualification, Fremont generally required that borrowers have a debt-to-income ratio of less than or equal to fifty per cent — that is, that the borrowers' monthly debt obligations, including the applied-for mortgage, not exceed one-half their income. However, in calculating the debt-to-income ratio, Fremont considered only the monthly payment required for the introductory rate period of the mortgage loan, not the payment that would ultimately be required at the substantially higher "fully indexed" interest rate.[11] As an additional feature to attract subprime borrowers, who typically had little or no savings, Fremont offered loans with no down payment. Instead of a down payment, Fremont would finance the full value of the property, resulting in a "loan-to-value ratio" approaching one hundred per cent. Most such financing was accomplished through

[10]The variable rate was based on the six month London Interbank Offered Rate (LIBOR), a market interest rate, plus a fixed margin (referred to as a "rate add") to reflect the risk of the loan. For example, the variable rate might be expressed as "LIBOR plus 5," meaning the LIBOR interest rate increased by an additional five percentage points as the rate add.

[11]The "fully indexed" rate refers to the interest rate that represents the LIBOR rate at the time of the loan's inception plus the rate add specified in the loan documents. The judge noted that calculation of the debt-to-income ratio based on the fully indexed rate generally yields a ratio that exceeds fifty per cent.

the provision of a first mortgage providing eighty per cent financing and an additional "piggy-back loan" providing twenty per cent.[12]

As of the time the Attorney General initiated this case in 2007, a significant number of Fremont's loans were in default.[13] An analysis by the Attorney General of ninety-eight of those loans indicated that all were ARM loans with a substantial increase in payments required after the first two (or in a few cases, three) years, and that ninety per cent of the ninety-eight had a one hundred per cent loan-to-value ratio.

On March 7, 2007, Fremont executed a "stipulation and consent to the issuance of an order to cease and desist" (consent agreement) with the Federal Deposit Insurance Corporation (FDIC), settling charges of unsound banking practices brought by that agency. The consent agreement ordered Fremont, inter alia, to cease and desist from originating ARM products to subprime borrowers in ways described as unsafe and unsound, including making loans with low introductory rates without considering borrowers' ability to pay the debt at the fully indexed rate, and with loan-to-value ratios approaching one hundred per cent. In entering into the consent agreement, Fremont did not admit to any wrongdoing.

On or about July 10, 2007, Fremont entered into a term sheet letter agreement (term sheet agreement) with the Massachusetts Attorney General, agreeing to give the Attorney General ninety days' notice before foreclosing on any Massachusetts residential mortgage loan. If the Attorney General objected, Fremont agreed to negotiate in good faith to resolve the objection, possibly by modifying the loan agreement. If no resolution could be reached,

---

[12]Two other features bear mention, although they are not directly relevant to the preliminary injunction. As previously indicated (see note 7, *supra*), 38.4 per cent of all Fremont's loans were stated income loans without income documentation required. In addition, 12.2 per cent of Fremont's loans offered the borrower lower monthly payments based on a forty-year amortization schedule, with a balloon payment required at the end of thirty years; the usual amortization schedule was based on a thirty-year period.

[13]As of January 15, 2008, Fremont had allegedly indicated to the Attorney General that it intended to foreclose on approximately twenty per cent of its loans. We take notice that the industry-wide delinquency rate has increased in the intervening months.

the Attorney General was granted an additional fifteen days in which to determine whether to seek an injunction.

As it turned out, the Attorney General objected to every proposed foreclosure that Fremont identified except those where the home was not owner-occupied and Fremont had been unable to contact the borrower. On October 4, 2007, the Attorney General filed this action. On December 10, 2007, Fremont exercised its right to terminate the term sheet agreement, on the grounds that the Attorney General had "no intention of engaging in a meaningful review process on a borrower-by-borrower basis." However, in the same letter Fremont stated that it would continue to seek to avoid foreclosure and to provide the Attorney General with loan files prior to foreclosure. The Attorney General then filed the motion for preliminary injunctive relief.

The judge granted a preliminary injunction in a memorandum of decision dated February 25, 2008. In his decision, the judge found no evidence in the preliminary injunction record that Fremont encouraged or condoned misrepresentation of borrowers' incomes on stated income loans, or that Fremont deceived borrowers by concealing or misrepresenting the terms of its loans. However, the judge determined that the Attorney General was likely to prevail on the claim that Fremont's loans featuring a combination of the following four characteristics qualified as "unfair" under G. L. c. 93A, § 2: (1) the loans were ARM loans with an introductory rate period of three years or less; (2) they featured an introductory rate for the initial period that was at least three per cent below the fully indexed rate; (3) they were made to borrowers for whom the debt-to-income ratio would have exceeded fifty per cent had Fremont measured the borrower's debt by the monthly payments that would be due at the fully indexed rate rather than under the introductory rate; and (4) the loan-to-value ratio was one hundred per cent, or the loan featured a substantial prepayment penalty (defined by the judge as greater than the "conventional prepayment penalty" defined in G. L. c. 183C, § 2) or a prepayment penalty that extended beyond the introductory rate period.

The judge reasoned that Fremont as a lender should have recognized that loans with the first three characteristics just described were "doomed to foreclosure" unless the borrower

could refinance the loan at or near the end of the introductory rate period, and obtain in the process a new and low introductory rate.[14] The fourth factor, however, would make it essentially impossible for subprime borrowers to refinance unless housing prices increased, because if housing prices remained steady or declined, a borrower with a mortgage loan having a loan-to-value ratio of one hundred per cent or a substantial prepayment penalty was not likely to have the necessary equity or financial capacity to obtain a new loan. The judge stated that, "[g]iven the fluctuations in the housing market and the inherent uncertainties as to how that market will fluctuate over time . . . it is unfair for a lender to issue a home mortgage loan secured by the borrower's principal dwelling that the lender reasonably expects .will fall into default once the introductory period ends unless the fair market value of the home has increased at the close of the introductory period. To issue a home mortgage loan whose success relies on the hope that the fair market value of the home will increase during the introductory period is as unfair as issuing a home mortgage loan whose success depends on the hope that the borrower's income will increase during that same period."

The judge concluded that the balance of harms favored granting the preliminary injunction, and that the public interest would be served by doing so. The injunction he granted requires Fremont to do the following: (1) to give advance notice to the Attorney General of its intent to foreclose on any of its home mortgage loans; and (2) as to loans that possess each of the four characteristics of unfair loans just described and that are secured by the borrower's principal dwelling (referred to in the injunction as "presumptively unfair" loans), to work with the Attorney General to "resolve" their differences regarding foreclosure — presumably through a restructure or workout of the loan. If the loan cannot be worked out, Fremont is required to obtain approval for foreclosure from the court. The judge made

---

[14]The judge's prognosis of doom followed from the fact that the interest payments required when the introductory rate period ended and the fully indexed rate came into play would be significantly greater than the payments called for under the introductory rate (so-called "payment shock"). As a result, the borrower's debt-to-income ratio would necessarily increase, probably and foreseeably beyond the borrower's breaking point.

clear that the injunction in no way relieved borrowers of their obligation ultimately to prove that a particular loan was unfair and foreclosure should not be permitted, or their obligation to repay the loans they had received.

In March, 2008, approximately one month after the issuance of the preliminary injunction, Fremont announced it had entered into an agreement with Carrington Mortgage Services, LLC, to sell certain rights to service mortgage loans. In response, the Attorney General sought a modification of the injunction to require that any assignment, sale, or transfer of ownership rights or servicing obligations by Fremont be conditioned on the assignee's or purchaser's acceptance of the obligations imposed by the preliminary injunction. The judge granted this relief with respect to all future assignments or sales that Fremont might make, modifying the original preliminary injunction in a separate order dated March 31, 2008 (modification order).[15]

2. *Standard of review.* We review the grant or denial of a preliminary injunction to determine whether the judge abused his discretion, that is, whether the judge applied proper legal standards and whether there was reasonable support for his evaluation of factual questions. *Packaging Indus. Group, Inc.* v. *Cheney*, 380 Mass. 609, 615 (1980). Before issuing a preliminary injunction, the judge must determine that the plaintiff has shown a likelihood of success on the merits of the case at trial. *Commonwealth* v. *Mass. CRINC*, 392 Mass. 79, 87 (1984), citing *Packaging Indus. Group, Inc.* v. *Cheney, supra* at 617. If the plaintiff is the Attorney General, the judge must then determine "that the requested order promotes the public interest, or, alternatively, that the equitable relief will not adversely affect the public." *Commonwealth* v. *Mass. CRINC, supra* at 89. "[W]hile weight will be accorded to the exercise of discretion by the judge below, if the order was predicated solely on documentary evidence we may draw our own conclusions from the record." *Packaging Indus. Group, Inc.* v. *Cheney, supra* at 616.

---

[15]While the judge issued two separate orders and Fremont has appealed from both, Fremont does not offer separate arguments in connection with the two orders. We follow the same course, and refer hereafter to a single preliminary injunction order.

3. *Discussion.* Fremont argues that the judge committed two "fundamental" errors of law in concluding that the Attorney General was likely to prevail on the merits of her c. 93A claim: first, the judge in effect, and improperly, applied the provisions of the Massachusetts Predatory Home Loan Practices Act, G. L. c. 183C, to Fremont's loans, even though the loans are not subject to c. 183C; and second, the judge failed to recognize that under G. L. c. 93A, § 3, Fremont's loans are exempt from c. 93A because all of Fremont's challenged loan terms were permitted under the Federal and Massachusetts laws and regulatory standards governing mortgage lenders. Fremont also contends that the judge erred in determining that the public interest would be served by the preliminary injunction order. We address these arguments separately below. Before doing so, we consider a basic claim that lies underneath all of Fremont's legal challenges to the injunction.

a. *Retroactive application of unfairness standards.* Fremont's basic contention is that, while the terms of its subprime loans may arguably seem "unfair" within the meaning of G. L. c. 93A, § 2, if judged by current standards applicable to the mortgage lending industry, they did not violate any established concept of unfairness at the time they were originated; the judge, in Fremont's view, applied new rules or standards for defining what is "unfair" in a retroactive or ex post facto fashion — a result that is not in accord with the proper interpretation of c. 93A, § 2, and also represents "bad policy," because (among other reasons) lenders cannot know what rules govern their conduct, which will reduce their willingness to extend credit, hurting Massachusetts consumers. We do not agree that the judge applied a new standard retroactively.

General Laws c. 93A, § 2 (*a*), makes unlawful any "unfair or deceptive acts or practices in the conduct of any trade or commerce." Chapter 93A creates new substantive rights and, in particular cases, "mak[es] conduct unlawful which was not unlawful under the common law or any prior statute." *Kattar* v. *Demoulas*, 433 Mass. 1, 12 (2000), quoting *Commonwealth* v. *DeCotis*, 366 Mass. 234, 244 n.8 (1974). The statute does not define unfairness, recognizing that "[t]here is no limit to human inventiveness in this field." *Kattar* v. *Demoulas*, *supra* at 13,

quoting *Levings* v. *Forbes & Wallace, Inc.*, 8 Mass. App. Ct. 498, 503 (1979). What is significant is the particular circumstances and context in which the term is applied. See *Kerlinsky* v. *Fidelity & Deposit Co.*, 690 F. Supp. 1112, 1119 (D. Mass. 1987), aff'd, 843 F.2d 1383 (1st Cir. 1988). It is well established that a practice may be deemed unfair if it is "within at least the penumbra of some common-law, statutory, or other established concept of unfairness." *PMP Assocs., Inc.* v. *Globe Newspaper Co.*, 366 Mass. 593, 596 (1975). See *Milliken & Co.* v. *Duro Textiles, LLC*, 451 Mass. 547, 562-563 (2008), and cases cited.

Fremont highlights the judge's statement that at the time Fremont made the loans in question between 2004 and March of 2007, loans with the four characteristics the judge identified as unfair were not considered by the industry or more generally to be unfair; Fremont argues this acknowledgment by the judge is proof that the judge was creating a new definition or standard of unfairness. The argument lacks merit. First, the judge's statement that Fremont's combination of loan features were not recognized to be unfair does not mean the converse: that the loans were recognized to be fair. More to the point, at the core of the judge's decision is a determination that when Fremont chose to combine in a subprime loan the four characteristics the judge identified, *Fremont* knew or should have known that they would operate in concert essentially to guarantee that the borrower would be unable to pay and default would follow unless residential real estate values continued to rise indefinitely[16] — an assumption that, in the judge's view, logic and experience had already shown as of January, 2004, to be unreasonable. The judge concluded that the Attorney General was likely to prove that Fremont's actions, in originating loans with terms that in combination would lead predictably to the consequence of the borrowers' default and foreclosure, were within established concepts of unfairness at the time the loans were made, and thus in violation of G. L. c. 93A, § 2. The record supports this conclusion.

Fremont correctly points out that as a bank in the business of

---

[16]It would be necessary for housing values to continue to rise so that the borrower could refinance his or her loan at the end of the introductory rate period, before the (likely) unaffordable indexed rate came into play.

mortgage lending, it is subject to State and Federal regulation by a variety of agencies.[17] Well before 2004, State and Federal regulatory guidance explicitly warned lending institutions making subprime loans that, even if they were in compliance with banking-specific laws and regulations and were "underwrit[ing] loans on a safe and sound basis, [their] policies could still be considered unfair and deceptive practices" under G. L. c. 93A. Consumer Affairs and Business Regulation, Massachusetts Division of Banks, Subprime Lending (Dec. 10, 1997).[18] More particularly, the principle had been clearly stated before 2004 that loans made to borrowers on terms that showed they would be unable to pay and therefore were likely to lead to default were unsafe and unsound, and probably unfair. Thus, an interagency Federal guidance published January 31, 2001, jointly by the Office of the Comptroller of the Currency (OCC), the Board of Governors of the Federal Reserve System, the FDIC, and the Office of Thrift Supervision, stated: "Loans to borrowers who do not demonstrate the capacity to repay the loan, *as structured*, from sources other than the collateral pledged are generally considered unsafe and unsound" (emphasis supplied).[19]

---

[17]State agencies regulating mortgage lending by banks such as Fremont and other lenders include the Massachusetts Division of Banks, and Federal agencies include the Office of the Comptroller of the Currency (OCC), the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation (FDIC), and the Office of Thrift Supervision.

[18]See also Interagency Guidance on Subprime Lending at 5 (March 1, 1999); Interagency Guidance on High LTV [Loan-To-Value] Residential Real Estate Lending at 6 (Oct. 8, 1999); OCC Advisory Letter, Guidelines for National Banks to Guard Against Predatory and Abusive Lending Practices, AL-2003-2 at 1 (Feb. 21, 2003); Unfair or Deceptive Acts or Practices by State-Chartered Banks (Mar. 11, 2004) (FDIC); Interagency Guidance on Nontraditional Mortgage Product Risks, 71 Fed. Reg. 58,609, 58,617 (Oct. 4, 2006).

[19]"Unsafe and unsound" refers to practices that carry too high a risk of financial harm to the lending institution, rather than to the consumer. Not all conduct that is institutionally unsafe and unsound is harmful to borrowers. However, when the lending institution's practices are deemed unsafe and unsound because they create too high a risk of default and foreclosure, the borrower, as the counterparty to the loan, obviously faces the same risk. Accordingly, such lending practices may indicate unfairness under G. L. c. 93A. Cf. Consumer Affairs and Business Regulation, Massachusetts Division of Banks, Subprime Lending (Dec. 10, 1997) (warning of both safety and soundness issues, and consumer protection issues, arising from subprime lending); OCC, Guidelines

Expanded Guidance for Subprime Lending Programs at 11 (Jan. 31, 2001). On February 21, 2003, one year before the first of Fremont's loans at issue, the OCC warned that certain loans could be unfair to consumers:

> "When a loan has been made based on the foreclosure value of the collateral, rather than on a determination that the borrower has the capacity to make the scheduled payments under the terms of the loan, based on the borrower's current and expected income, current obligations, employment status, and other relevant financial resources, the lender is effectively counting on its ability to seize the borrower's equity in the collateral to satisfy the obligation and to recover the typically high fees associated with such credit. Not surprisingly, such credits experience foreclosure rates higher than the norm.
>
> "[S]uch disregard of basic principles of loan underwriting lies at the heart of predatory lending . . . ."

OCC Advisory Letter, Guidelines for National Banks to Guard Against Predatory and Abusive Lending Practices, AL 2003-2 at 2 (Feb. 21, 2003).[20,21]

The record here suggests that Fremont made no effort to

---

for National Banks to Guard Against Predatory and Abusive Lending Practices, AL 2003-2 at 1 (Feb. 21, 2003) ("even where the particular attributes of a loan are not subject to a specific prohibition, loans reflecting abusive practices nevertheless can involve unfair and deceptive conduct and present significant safety and soundness, reputation, and other risks to national banks").

[20]This guidance uses the words "predatory" and "abusive" as descriptive terms for certain lending practices; the guidance is not seeking to interpret terms that appear in a statute. OCC, Guidelines for National Banks to Guard Against Predatory and Abusive Lending Practices, AL 2003-2 at 1 (Feb. 21, 2003). Fremont argues that the guidance did not apply to its activities because it is not a national bank. That fact notwithstanding, we find the guidance instructive as to established concepts of unfairness that applied to national banks and other banks at the time, for a number of reasons: the discussion of "predatory" lending is part of an analysis of the OCC's enforcement powers under § 5 of the Federal Trade Commission Act, the Federal analog to G. L. c. 93A, *id.* at 2; the guidance notes that the same rules may be enforced against other banks by other agencies, *id.* at 4 n.11; and the guidance was issued in response to "inquiries as to whether state laws and local initiatives addressing certain types of abusive lending practices" applied to national banks, *id.* at 1.

[21]Other Federal regulatory guidance advisories made similar points concern-

determine whether borrowers could "make the scheduled payments under the terms of the loan." Rather, as the judge determined, loans were made in the understanding that they would have to be refinanced before the end of the introductory period. Fremont suggested in oral argument that the loans were underwritten in the expectation, reasonable at the time, that housing prices would improve during the introductory loan term, and thus could be refinanced before the higher payments began. However, it was unreasonable, and unfair to the borrower, for Fremont to structure its loans on such unsupportable optimism. As a bank and mortgage lender, Fremont had been warned repeatedly before 2004 (in the context of guidance on loan safety and soundness) that it needed to consider the performance of its loans in declining markets. See, e.g., Consumer Affairs and Business Regulation, Massachusetts Division of Banks, Subprime Lending (Dec. 10, 1997) ("[M]ost subprime loans have been originated during robust economic conditions and have not been tested by a downturn in the economy. Management must ensure that the institution has adequate financial and operational strength to address these concerns effectively").[22] Fremont cannot now claim that it was taken by surprise by the effects of

ing the importance of lenders' evaluating the borrowers' capacity to pay the mortgage loan as structured. See Credit Risk Management Guidance for Home Equity Lending (May 16, 2005) (interagency) (regarding home equity lines of credit, underwriting standards "should include an assessment of the borrower's ability to amortize the fully drawn line over the loan term and to absorb potential increases in interest rates"); Interagency Guidance on Nontraditional Mortgage Product Risks, 71 Fed. Reg. 58,609, 58,613 (Oct. 4, 2006) (for "nontraditional" loans, an analogous category to Fremont's loans, "analysis of a borrower's repayment capacity should include an evaluation of their ability to repay the debt by final maturity at the fully indexed rate, assuming a fully amortizing repayment schedule").

[22]See also Interagency Guidance on High LTV Residential Real Estate Lending, at 2 (Oct. 8, 1999); Expanded Guidance for Subprime Lending Programs (interagency) (Jan. 31, 2001) ("Institutions should project the performance of their subprime loan pools under conservative 'stress test' scenarios, including an estimation of the portfolio's susceptibility to deteriorating economic, market, and business conditions"); Credit Risk Management Guidance for Home Equity Lending (May 16, 2005) (interagency) ("Financial institutions should ensure that risk management practices keep pace with the growth and changing risk profile of home equity portfolios. Management should actively assess a portfolio's vulnerability to changes in consumers' ability to pay and the potential for declines in home values").

an economic decline, or that it should not be held responsible.

Finally, the conclusion that Fremont's loans featuring the four characteristics at issue violated established concepts of unfairness is supported by the consent agreement that Fremont entered into with the FDIC on March 7, 2007, the date Fremont stopped making loans.[23] The consent agreement contains no admission of wrongdoing by Fremont, and we do not consider it as evidence of liability on Fremont's part. However, we view it as evidence of existing policy and guidance provided to the mortgage lending industry. The fact that the FDIC ordered Fremont to cease and desist from the use of almost precisely the loan features that are included in the judge's list of presumptively unfair characteristics indicates that the FDIC considered that under established mortgage lending standards, the marketing of loans with these features constituted unsafe and unsound banking practice with clearly harmful consequences for borrowers.

---

[23]The consent agreement ordered Fremont to cease and desist from "unsafe and unsound practices and violations of law and/or regulations," including "making mortgage loans without adequately considering the borrower's ability to repay the mortgage according to its terms," and "marketing and extending adjustable-rate mortgage ('ARM') products to subprime borrowers" with practices such as:

> "(i) qualifying borrowers for loans with low initial payments based on an introductory or 'start' rate that will expire after an initial period, without adequate analysis of the borrower's ability to repay the debt at the fully-indexed rate;
>
> . . .
>
> "(iii) containing product features likely to require frequent refinancing to maintain an affordable monthly payment and/or to avoid foreclosure;
>
> "(iv) including substantial prepayment penalties and/or prepayment penalties that extend beyond the initial interest rate adjustment period;
>
> . . .
>
> "(vi) approving borrowers for loans with inadequate debt-to-income analyses that do not properly consider the borrowers' ability to meet their overall level of indebtedness and common housing expenses; and/or
>
> "(vii) approving loans or 'piggyback' loan arrangements with loan-to-value ratios approaching or exceeding 100 percent of the value of the collateral . . . ."

Such unsafe and unsound conduct on the part of a lender, insofar as it leads directly to injury for consumers, qualifies as "unfair" under G. L. c. 93A, § 2.

We turn to the specific challenges to the judge's order that Fremont raises.

b. *General Laws c. 183C.* General Laws c. 183C, the Massachusetts Predatory Home Loan Practices Act, effective November 7, 2004 (act), prohibits a lender from making a "high-cost home mortgage loan"[24] unless the lender reasonably believes at the time the loan is made that the borrower "will be able to make the scheduled payments to repay the home loan based upon a consideration of the [borrower's] current and expected income, current and expected obligations, employment status, and other financial resources other than the borrower's equity in the dwelling which secures repayment of the loan." G. L. c. 183C, § 4. This section further states, however, that a borrower is presumed to be able to repay the loan if the borrower's debt-to-income ratio, calculated based on the fully indexed rate associated with an ARM loan, does not exceed fifty per cent of the borrower's verified monthly gross income. *Id.* at § 4, second par. The act prohibits a high-cost home mortgage loan from containing any provision for prepayment fees or penalties. G. L. c. 183C, § 5. Chapter 183C expressly provides that a violation of the statute constitutes a violation of G. L. c. 93A. G. L. c. 183C, § 18 (*a*).

Fremont's mortgage loans were not "high cost home mortgage loans" governed by G. L. c. 183C, as the judge recognized. Fremont contends, however, that the judge improperly interpreted c. 183C to reach Fremont's loans, and thereby violated basic rules of statutory construction that prohibit inferring a legislative intent to reach conduct that the statute's unambiguous language clearly does not cover.

Fremont's argument lacks merit. Even though the loans have different terms from Fremont's, the conduct the act prohibits,

[24] A "high cost home mortgage loan" is defined in G. L. c. 183C, § 2, as a loan securing the borrower's principal dwelling and that either exceeds by more than eight percentage points (for a first mortgage) the yield on Treasury securities with a comparable maturity period, or features total points and fees the greater of five per cent of the total loan or $400.

and deems a violation of G. L. c. 93A, is similar to the central element of unfairness the judge found in Fremont's lending practices: the origination of a home mortgage loan that the lender should recognize at the outset the borrower is not likely to be able to repay. See G. L. c. 183C, § 4. That the Legislature chose in the act to focus specifically on home loan mortgages with different terms and features from Fremont's is not dispositive; the question is whether the act may be read to establish a concept of unfairness that may apply in similar contexts. As stated by the single justice of the Appeals Court, the judge appropriately could and did "look to Chapter 183C as an established, statutory expression of public policy that it is unfair for a lender to make a home mortgage loan secured by the borrower's principal residence in circumstances where the lender does not reasonably believe that the borrower will be able to make the scheduled payments and avoid foreclosure."[25]

c. *General Laws c. 93A, § 3.* Fremont argues that the Commonwealth's claim is barred by G. L. c. 93A, § 3, because Fremont's actions were permitted by the law as it existed at the time it originated the loans.[26] We disagree.

General Laws c. 93A, § 3, provides:

"Nothing in this chapter shall apply to transactions or

---

[25]Fremont further argues that, rather than looking to G. L. c. 183C, the judge should have analyzed the Commonwealth's claim under *Penney* v. *First Nat'l Bank,* 385 Mass. 715 (1982), and *Zapatha* v. *Dairy Mart, Inc.,* 381 Mass. 284 (1980). Those cases dealt with alleged unfairness arising from contractual unconscionability, a concept of unfairness established by G. L. c. 106, § 2-302, and 940 Code Mass. Regs. § 3.16 (1) (1978). See *Penney* v. *First Nat'l Bank, supra* at 720; *Zapatha* v. *Dairy Mart, Inc., supra* at 291, 299. Because we agree with the judge that Fremont violated an established concept of unfairness in issuing loans without meaningful consideration of borrowers' ability to repay, we need not look to other concepts of unfairness such as unconscionability.

[26]Fremont's reliance on G. L. c. 93A, § 3, properly should have been stated as an affirmative defense in its answer. *Fleming* v. *National Union Fire Ins. Co.,* 445 Mass. 381, 389 (2005) ("In essence, the exemption enunciated in § 3 is an affirmative defense that must be asserted in the pleadings and proved at trial"). However, where Fremont's answer generally argued that "Massachusetts and federal law specifically permit the loans and products offered by [Fremont]," and where Fremont raised the defense in its opposition to the Commonwealth's motion for a preliminary injunction, we see no prejudice to the Commonwealth, and consider the substance of Fremont's claim.

actions otherwise permitted under laws as administered by any regulatory board or officer acting under statutory authority of the commonwealth or of the United States.

"For the purpose of this section, the burden of proving exemptions from the provisions of this chapter shall be upon the person claiming the exemptions."

This provision must be read together with G. L. c. 93A, § 2. That section "created new substantive rights," and thus "[t]he fact that particular conduct is permitted by statute or by common law principles should be considered, but it is not conclusive on the question of unfairness." *Schubach* v. *Household Fin. Corp.*, 375 Mass. 133, 137 (1978), quoting *Commonwealth* v. *DeCotis*, 366 Mass. 234, 244 n.8 (1974). See *Kattar* v. *Demoulas*, 433 Mass. 1, 13 (2000) ("Legality of underlying conduct is not necessarily a defense to a claim under c. 93A"). A defendant's burden in claiming the exemption is "a difficult one to meet. To sustain it, a defendant must show more than the mere existence of a related or even overlapping regulatory scheme that covers the transaction. Rather, a defendant must show that such scheme affirmatively *permits* the practice which is alleged to be unfair or deceptive" (emphasis in original). *Fleming* v. *National Union Fire Ins. Co.*, 445 Mass. 381, 390 (2005), quoting *Bierig* v. *Everett Sq. Plaza Assocs.*, 34 Mass. App. Ct. 354, 367 n.14 (1993).

The judge concluded, as have we, that the Attorney General is likely to succeed on her claim that Fremont's practice of originating loans bearing the particular combination of four features identified in the preliminary injunction was unfair. To carry its burden under G. L. c. 93A, § 3, of demonstrating that a regulatory scheme "affirmatively *permits* the practice which is alleged to be unfair," Fremont must show that some regulatory scheme affirmatively permitted the practice of combining all of those features. Fremont has not done so. Rather, it cites authority demonstrating, it asserts, that each of the four features was permitted by statute and regulatory authorities. Assuming, without deciding, that Fremont is correct that every feature was affirmatively permitted separately, it was Fremont's choice to

combine them into a package that it should have known was "doomed to foreclosure"; the relevant question is whether some State or Federal authority permitted that combination. No authority did.[27] Cf. *Commonwealth* v. *DeCotis*, 366 Mass. 234, 239-240 (1974) (defendant lessors and managers of mobile home park failed to show that under laws as "*as administered*" by local board of health they were permitted to charge resale fee [emphasis in original]).

d. *Public interest.* Because the Attorney General, in the name of the Commonwealth, brings this case to carry out her statutory mandate to enforce the Consumer Protection Act, it is necessary to consider whether the preliminary injunction order promotes the public interest. *Commonwealth* v. *Mass. CRINC*, 392 Mass. 79, 88-89 (1984). Fremont argues that it does not, primarily because in Fremont's view, the order imposes new standards on lending practices that were considered permissible and acceptable when the loans were made. The result, Fremont claims, will be an unwillingness on the part of lenders to extend credit to Massachusetts consumers because they will be unwilling to risk doing business in an environment where standards are uncertain and the rules may change after the fact.

Our previous discussion, and rejection, of Fremont's claim that the judge retroactively applied new unfairness standards disposes of Fremont's public interest argument; we do not accept the premise that, in concluding that Fremont is likely to be found to have violated established concepts of unfairness, the judge's order has created an environment of uncertainty that lenders will shun. The injunction order crafted by the judge strikes a balance between the interests of borrowers who face foreclosure and loss of their homes under home loan mortgage terms that are at least presumptively unfair, on the one hand; and the interest of the lender in recovering the value of its loans to borrowers who received the benefit of those loaned funds

---

[27]Fremont asserts that the loan characteristics were "permitted when combined," but the only authorities Fremont cites are the October 4, 2006, Interagency Guidance on Nontraditional Mortgage Product Risks, 71 Fed. Reg. 58,609 (2006), and the July 10, 2007, Statement on Subprime Mortgage Lending (interagency), 72 Fed. Reg. 37,569 (2007). Only the former was in effect for even a small part of the relevant time period, and in any case, neither authority supports Fremont's contention.

and continue to have a contractual obligation to repay, on the other. The order does not bar foreclosure as a remedy for the lender, nor does it relieve borrowers of their obligations ultimately to repay the loans. Rather, it requires, where the mortgage loan terms include all four features deemed presumptively unfair, that Fremont explore alternatives to foreclosure in the first instance (a step that Fremont has indicated its desire to take in any event), and then seek approval of the court. If the court does not approve the foreclosure, that decision merely leaves the preliminary injunction in place until the Commonwealth has an opportunity to try to prove that the particular loan at issue actually violated c. 93A — a burden that is never shifted to Fremont. We conclude the order serves the public interest.

4. *Conclusion.* A judgment is to be entered affirming the grant of the preliminary injunction and remanding the case to the Superior Court for further proceedings.

*So ordered.*