NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

13-P-1805                                      Appeals Court


   ELNEDIS A. MORONTA  vs.  NATIONSTAR MORTGAGE, LLC & another.[1]


                     No. 13-P-1805.

      Norfolk.     December 10, 2014. - November 5, 2015.

          Present:  Katzmann, Hanlon, & Maldonado, JJ.



Mortgage, Foreclosure.  Real Property, Mortgage.  Consumer
     Protection Act, Mortgage of real estate, Unfair act or
     practice.  Practice, Civil, Consumer protection case,
     Summary judgment.




     Civil action commenced in the Superior Court Department on
July 23, 2010.

     A motion for summary judgment was heard by John P. Connor,
Jr., J., and a motion for reconsideration was heard by him; a
motion for summary judgment was heard by Thomas A. Connors, J.;
and judgment was entered by John P. Connor, Jr., J.


     Irene H. Bagdoian for the plaintiff.
     Dean J. Wagner for Signature Group Holdings, Inc.
     Jennifer J. Normand for Nationstar Mortgage, LLC.




     [1] Signature Group Holdings, Inc., successor to Fremont
Investment & Loan.  References to Fremont in this opinion
include Signature Group Holdings, Inc.

MALDONADO, J. Elnedis Moronta (the borrower) appeals from final judgments entered following the decisions of judges of the Superior Court granting motions for summary judgment for the defendants on the borrower's claims that Fremont Investment & Loan (Fremont) and its assignee, Nationstar Mortgage, LLC (Nationstar), (i) violated an injunction imposed on Fremont and later extended to Fremont's assignees foreclosing on his mortgage without the approval of the Attorney General, (ii) violated G. L. c. 93A by structuring a mortgage consisting of high-cost loans which Fremont had no reasonable expectation the borrower could repay, and misleading the borrower as to the viability of the transaction; (iii) violated c. 93A by using unfair and deceptive loan modification practices; and (iv) should be enjoined from evicting the borrower from his home. Because we conclude that the borrower has at least raised a question of fact on his c. 93A claim, we reverse.

Background. On July 9, 2004, the borrower purchased the home located at 152 Independence Avenue in Quincy for $348,000 financed with a mortgage loan of $330,600 from Wells Fargo Bank, N.A. (Wells Fargo). The Wells Fargo loan was an adjustable rate loan with an initial rate of 5.25 percent and an initial monthly payment of $2,137.32, including taxes and insurance. The maximum interest rate was 11.25 percent. After the rate increased to approximately eight percent and his monthly

payments increased to $2,884, the borrower had difficulty making his monthly mortgage payments along with his credit card debt of approximately $630 per month. Carrying a total monthly debt of approximately $3,514, the borrower sought to refinance the loan to consolidate his debt and reduce his monthly payments. He engaged a mortgage broker, Popular Mortgage Group, which submitted his mortgage application to Fremont.

The borrower asserts that his monthly income on his loan application was inflated to $8,500 from the $6,000 figure he provided and which, he contends, was supported by documentation he submitted.[2] The parties contest who bore responsibility for the $8,500 figure.

Fremont structured the refinancing, executed by the borrower on January 24, 2007, by granting the borrower two loans totaling $370,000: the "first loan," an adjustable rate note in the principal amount of $296,000 at an initial rate of 7.9 percent and an adjustable rate feature which would adjust upward by adding 5.528 percent to the LIBOR index[3] at the time of any

---

[2] Fremont contends in the joint statement of material facts that it has insufficient information to either admit or deny the allegation that the borrower's income was approximately $6,000, and therefore it denied the same. Fremont further contends the borrower's income is not a material fact precluding summary judgment.

[3] As explained in Commonwealth v. Fremont Inv. & Loan, 452 Mass. 733, 737 n.10 (2008), Fremont's variable rate "was based on the six month London Interbank Offered Rate (LIBOR), a market

change date, to a maximum of 13.9 percent, and a "second loan" in the amount of $74,000 at a fixed interest rate of 10.5 percent (together, the refinance loans). The first upward adjustment on the first loan was scheduled to occur three years from the date of the loan, at which time the rate could adjust upward by as much as three percent. Thereafter, the rate could adjust every six months, with a maximum 1.5 percent increase at each change, until reaching a maximum of six percent over the original 7.9 percent. The borrower was told by the broker that the two loans would provide 100 percent financing and would be more convenient for him.[4]

The initial monthly payment on the first loan was $2,368.59, including taxes and insurance of $481.16 and the

interest rate, plus a fixed margin (referred to as a 'rate add') to reflect the risk of the loan. For example, the variable rate might be expressed as 'LIBOR plus 5,' meaning the LIBOR interest rate increased by an additional five percentage points as the rate add."

[4] Although the borrower contends he was not given an opportunity to read the loan documents because Fremont's attorney told him it would take "weeks," he admits he signed documents for both loans, including the adjustable rate note; fixed rate note; balloon payment rider; balloon note addendum; mortgages; adjustable rate and balloon payment rider; estimated payment letters; lender's closing instructions; truth-in-lending disclosure statement; itemization of amount financed; notice of right to cancel; escrow/impound account agreement; Massachusetts application disclosures; Massachusetts borrower benefit worksheet and certifications; appraisal disclosure; mortgage lender disclosures required by the Attorney General's consumer protection regulations; consumer's guide to obtaining a home mortgage; Fremont refinance benefit letter; loan transaction fees; and credit account reporting disclosure.

monthly payment on the second loan was $676.91, for a total of $3,045.90. If the borrower's monthly income was $6,000, even the initial payments exceeded fifty percent of his gross monthly income, and if it was $8,500, the payments constituted thirty-six percent of that income.

Presumably to keep the monthly payment low, the first note was amortized over fifty years, although the term of the loan was thirty years. This resulted in a balloon payment at the end of the thirty-year term. The balloon rider signed by the borrower did not reveal the amount of the balloon payment. The truth in lending disclosure statement reveals that the balloon payment would be $264,963, which is approximately ninety percent of the original note. It is not clear whether the balloon payment includes additional charges and interest which would bear on any calculation of the actual interest rate.[5]

The truth in lending disclosure statement also indicates the monthly payment on the first note would adjust upward after three years to $2,684.84 for the rest of the thirty-year term. Thus, the total monthly payment after the first three years for the two refinance loans and taxes and insurance would be $4,023. If, however, the interest rate further adjusted to the ceiling

---

[5] The adjustable mortgage loan disclosure indicates the balloon payment includes a regular monthly payment together with the remaining unpaid principal balance of the loan, all accrued and unpaid interest, and all charges due under the loan note.

of 13.9 percent, monthly payments would be in the vicinity of $3,400, bringing the monthly payments to $4,558.[6] Even accepting that the borrower's monthly income was $8,500, the monthly payment could exceed fifty percent of the borrower's income after four years, and within three years would exceed by several hundred dollars the monthly amount that the borrower had already indicated he could not handle and that had led to his desire to refinance.

It is undisputed that the refinance loans paid off the Wells Fargo loan in the amount of $322,118.83 and provided the borrower with $37,114.23 at closing. The borrower used the money to pay off his credit card debt and do repair work on the property.[7] Nonetheless, the borrower admits that he was unable to make his payments because his income was reduced as a result of the decline in the economy. His last payment on the notes was made in November of 2008, and his inability to pay preceded any interest rate increase on the first loan. Nationstar foreclosed on the property in November of 2009 and purchased the property at the foreclosure sale for $260,897.06.

---

[6] It is unclear why the truth in lending disclosure does not reveal these potential payments.

[7] Although an appraisal report dated January 5, 2007, valued the property at $420,000, the parties dispute which of them obtained the appraisal, and the borrower disputes the appraised value.

In July of 2007, Fremont notified the borrower that it was transferring the servicing of its notes to Nationstar. Fremont and Nationstar insist, supported by an affidavit of Ralph Uribarre, "AVP/Secondary and Master Servicer" for Signature Group Holdings, Inc.,[8] that all beneficial interest in the refinance loans was transferred to Nationstar on March 30, 2007, and all servicing rights in the loans were transferred to Nationstar on July 5, 2007.[9] The borrower points to the only transfer recorded in the registry of deeds, MERS's transfer of the mortgage to Nationstar recorded on May 14, 2009, to support his positon that Nationstar, as assignee of a Fremont home mortgage in 2009, was required to give notice to the Attorney General before foreclosing on his mortgage.[10]

Discussion. "We review the disposition of a motion for summary judgment de novo . . . to determine whether all material facts have been established such that the moving party is

---

[8] Uribarre states that Signature Group Holdings, Inc., is the successor in interest to Fremont Reorganizing Corporation, formerly known as Fremont Investment & Loan. See note 1, supra.

[9] Uribarre states that Fremont was the payee of the notes but that Mortgage Electronic Registration Systems, Inc. (MERS), as nominee of Fremont and/or its assignees, was the mortgagee of the mortgages executed by the borrower as security for the notes.

[10] See Commonwealth v. Fremont Inv. & Loan, 452 Mass. at 739-741 (Fremont preliminary injunction entered in February, 2008, and was extended to future assignees on March 31, 2008).

entitled to judgment as a matter of law . . . [and] [w]e construe all facts in favor of the nonmoving party."  American Intl. Ins. Co. v. Robert Seuffer GMBH & Co. Kg., 468 Mass. 109, 112, cert. denied, 135 S. Ct. 871 (2014) (quotation omitted).

Because Fremont transferred the loans and servicing rights to Nationstar in 2007, prior to the imposition of any injunction, and MERS thereafter held the mortgages for Nationstar as assignee of Fremont, we agree that Nationstar did not violate the injunction against Fremont.  The assignment of the notes and servicing rights preceded the injunction imposed in February of 2008 against Fremont and extended to Fremont's assigns in March of 2008.  Thus Nationstar was not required to notify the Attorney General prior to pursuing foreclosure against the borrower in 2009.  We also agree that Nationstar's negotiations with Moronta to modify the loans did not violate c. 93A.  Although it took effort and persistence on the borrower's part, Nationstar ultimately did offer to reduce the borrower's payments by $500 per month.  That this was not enough to meet the borrower's reduced monthly income does not mean Nationstar's refinancing negotiations were unfair within the meaning of G. L. c. 93A.  Moreover, that Nationstar went forward with foreclosure proceedings while negotiating with the borrower is not evidence of unfairness where the borrower concedes he was in default on his note.  We agree with the judge that the

borrower's claim of unfair and deceptive loan modification practices must fail.[11]  Accordingly, we move to the other aspects of the borrower's c. 93A claim, that are unrelated to the modification.[12]

"[General Laws c.] 93A prohibits the origination of a home mortgage loan that the lender should recognize at the outset that the borrower is not likely to be able to repay." Drakopoulos v. U.S. Bank Natl. Assn., 465 Mass. 775, 786 (2013), quoting from Frappier v. Countrywide Home Loans, Inc., 645 F.3d 51, 56 (1st Cir. 2011).  While in Commonwealth v. Fremont Inv. & Loan, 452 Mass. 733, 739, 747 (2008), the court identified four

___

[11] We reject Nationstar's argument that the borrower cannot proceed on his G. L. c. 93A claim because he failed to serve a demand letter pursuant to c. 93A, § 9, on Nationstar.  A written demand is required pursuant to G. L. c. 93A, § 9(3), as appearing in St. 1979, c. 406, § 2, unless "the prospective respondent does not maintain a place of business or does not keep assets within the commonwealth."  The borrower alleged in his complaint that no c. 93A letter was required because the defendants do not maintain places of business in the Commonwealth.  Nationstar's argument that its mortgages in the Commonwealth constitute assets, and therefore the notice requirement does apply even if it does not have a place of business in the Commonwealth, ignores that the statute is written in the disjunctive.

[12] Nationstar argues, apparently for the first time on appeal, that as assignee, it is not liable for c. 93A claims stemming from Fremont's origination of the loan.  We do not address arguments raised for the first time on appeal.  See Carey v. New England Organ Bank, 446 Mass. 270, 285 (2006).  We note, however, that "as a matter of common law, assignees are not shielded from liability under G. L. c. 93A by virtue of their assignee status."  Drakopoulos v. U.S. Bank Natl. Assn., 465 Mass. 775, 787 n.16 (2013).

characteristics that rendered the loans at issue there presumptively unfair pursuant to c. 93A,[13] and the loans at issue here arguably meet only some of those criteria, the Supreme Judicial Court has clarified that nothing in Fremont "was intended to suggest that the universe of predatory home loans is limited only to those meeting the four criteria present in that case." Drakopoulos v. U.S. Bank Natl. Assn., supra. "[T]he question is whether the lender should have recognized at the outset that the plaintiffs were unlikely to be able to repay the loan." Ibid. Indeed, the Supreme Judicial Court noted that banks had been advised as early as 2001 that "[l]oans to borrowers who do not demonstrate the capacity to repay the loan, as structured, from sources other than the collateral pledged are generally considered unsafe and unsound" and unfair to borrowers. Commonwealth v. Fremont Inv. & Loan, 452 Mass. at 744 (quotation omitted). We conclude that there is a genuine issue of material fact whether Fremont should have recognized at

---

[13] The loans (1) "were [adjustable rate mortgage] loans with an introductory rate period of three years or less; (2) . . . featured an introductory rate for the initial period that was at least three percent below the fully indexed rate; (3) . . . were made to borrowers for whom the debt-to-income ratio would have exceeded fifty percent had Fremont measured the borrower's debt by the monthly payments that would be due at the fully indexed rate rather than under the introductory rate; and (4) [had a] loan-to-value ratio [of] one hundred per cent, or the loan featured a substantial prepayment penalty . . . or a prepayment penalty that extended beyond the introductory rate period." Commonwealth v. Fremont Inv. & Loan, 452 Mass. at 739.

the outset that the borrower was unlikely to be able to repay the refinance loans at issue.

Here, there are a number of factors that should have put Fremont on notice that the borrower was unlikely to have the ability to repay the refinance loans.  The first two criteria articulated in Commonwealth v. Fremont Inv. & Loan, 452 Mass. at 739, are met:  the loan funding eighty percent of the total amount loaned is an adjustable rate loan with an introductory period of three years or less, and the introductory rate is at least three points below the fully indexed rate.  In addition, the loan funding twenty percent of the full amount is a fixed rate loan at the high interest rate of 10.5 percent.

Moreover, as we construe the record, there is at least a question of fact whether the debt to income ratio would have exceeded fifty percent of the borrower's gross monthly income, particularly if considered at the fully indexed rate and without ignoring, as the defendants do, the enormous balloon payment due at the end of the term.  First, the borrower contends that all of the information he provided to the broker indicated his monthly income was $6,000, and he did not notice that it had been inflated to $8,500 on the loan application when he signed it.  Neither party developed the record whether the broker was solely an agent for the borrower or whether it also had an agency relationship with Fremont.  Competing bald assertions

that the broker was or was not an agent of Fremont cannot be resolved on this record.  Moreover, even where a borrower signs a loan application listing a certain monthly income, we have allowed for the possibility that the borrower can show it was artificially inflated by the lender or, in this case, by Fremont's agent.  Drakopoulos v. U.S. Bank Natl. Assn., 465 Mass. at 788.

Second, as noted above, the monthly payments exceed fifty percent of even the $8,500 gross monthly income when the adjustable rate note is fully indexed.  In addition, spread over the thirty-year term of the note, in order to be able to make the balloon payment, the borrower would have had to effectively save some $722 per month.  There was no suggestion that Fremont considered whether, other than by a new loan, the borrower would be able to make the fully indexed monthly payments or the enormous balloon payment at the end of the term.  When the balloon payment is factored into the equation, a trier of fact might well conclude that Fremont should have recognized that the borrower was unlikely to be able to repay the loan as structured.

Addressing the fourth Fremont criterion, it is not clear to us that the loans at issue do not at least approach the 100 per cent financing the Supreme Judicial Court deemed unfair in Commonwealth v. Fremont Inv. & Loan, 352 Mass. at 739-740.

There, the Supreme Judicial Court noted that Fremont frequently financed properties 100 percent by dividing the amount financed into the two piggy-back loans representing eighty and twenty percent of the loan amount respectively.  See id. at 738 n.12. Fremont used the same piggy-back loan split here.  Nothing in the record explains the reason two loans were issued to the borrower instead of one.  Fremont contends this was not a 100 percent finance of the property because it obtained an appraisal prior to the loan closing that indicated the property had a value of $420,000, which means the loan to value ratio was eighty-eight percent.  While we agree that the borrower's reliance on Zillow, an Internet Web site, is inadequate to challenge the appraisal, where the piggy-back loan feature of the refinancing is otherwise unexplained, at least at the summary judgment stage, its use supports an adverse inference suggesting the loan to value ratio approached 100 percent or otherwise caused an underwriting concern that resulted in the use of two loans.  If, as the trial judge noted in Commonwealth v. Fremont Inv. & Loan, supra at 740, 100 percent financing is problematic because of its impacts on the possibility of refinancing in a declining market, we conclude there is at least a question of fact as to whether eighty-eight percent refinancing via an adjustable rate loan amortized over fifty years, with resulting minimal paydown of principal and a ninety

percent balloon payment at the end of thirty years, along with a 10.5 percent nonadjustable loan, also raises similar refinancing concerns.

For each of the loans, Fremont provided a "borrower benefit worksheet and certification" asserting that the refinance resulted in a reduction in the borrower's interest rate when comparing the new home loan with the old home loan, even though the instructions provided that for comparison purposes for adjustable rate loans Fremont should use the initial note rate plus the maximum lifetime cap for comparison purposes. The initial interest rate of the refinance loans considered together was 8.42 percent which arguably exceeded the prior interest rate of "around" eight percent even before the first note adjusted upward. But even if Fremont's calculations are correct and the adjusted rate on the original loan was 8.75 percent, certainly the maximum potential interest rate of 13.22 percent when both loans are considered together exceeded the original note's 11.25 percent maximum. Moreover, focus on the interest rate alone, without considering the prolonged amortization schedule and resulting delayed payment of principal and a net increase in interest payments, is deceiving. The effective interest rate paid on a thirty-year note that is amortized over fifty years is significantly greater than a thirty year note amortized over thirty years.

We are aware that the borrower benefited by being able to pay off the prior mortgage, pay off his credit cards, and make improvements to his home.  In addition, there was at least a temporary reduction in his monthly bills.  That reduction was to be relatively short-lived, however, and the enormous balloon payment at the end of the note casts doubt as to whether it is possible to say the monthly bills truly were reduced.  Moreover, if the only test were whether the borrower benefited in some way from a refinancing loan, no loan would violate G. L. c. 93A.

On the record presented, even if the refinancing loans at issue do not exactly meet the criteria set forth in Commonwealth v. Fremont Inv. & Loan, supra, in terms of loan to value ratio and percentage of financing, we conclude that the additional feature of the amortization over fifty years resulting in a balloon payment approaching ninety percent of the full amount of the adjustable rate note after thirty years of payments between $1,900 and $3,400 per month, along with higher net interest paid, raises a genuine issue of material fact as to whether the loan is unfair under G. L. c.  93A.[14]  As in Drakopoulos v. U.S. Bank Natl. Assn., 465 Mass. at 787, in these circumstances, "a determination whether the lender acted unfairly or deceptively,

---

[14] We have considered and rejected the defendants' claim that there were no damages here.

in violation of G. L. c. 93A, when originating the [borrower's] loan[s] is properly left to the finder of fact."

Judgments reversed.