SUSANNE DRAKOPOULOS & another[1] vs. U.S. BANK NATIONAL ASSOCIATION, trustee,[2] & another.[3,4]

Essex. March 4, 2013. - July 12, 2013.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, GANTS, DUFFLY, & LENK, JJ.

*Massachusetts Predatory Home Loan Practices Act. Consumer Protection Act,* Mortgage of real estate. *Real Property,* Mortgage. *Mortgage,* Assignment. *Assignment.*

In a civil action brought by plaintiff homeowners against a bank that was the assignee of a mortgage and against the servicer of the mortgage loan, alleging that the mortgage, the monthly payment of which was approximately $600 more than the plaintiffs' total monthly income, violated the Predatory Home Loan Practices Act, G. L. c. 183C (act); the Consumer Protection Act, G. L. c. 93A; and the Borrower's Interest Act, G. L. c. 183, § 28C, and that the loan was unconscionable, the judge erred in granting summary judgment in favor of the bank as a matter of law based on its claim that, as an assignee, it was not liable for the allegedly predatory practices of the original lender, where the act states that any person who is assigned a high-cost home mortgage loan is subject to all affirmative claims and any defenses with respect to the loan; on the other hand, the judge properly granted summary judgment as a matter of law in favor of the servicer, where nothing in the record permitted a conclusion that the servicer was an assignee of the loan and would have liability as such. [781-782]

In a civil action brought by plaintiff homeowners against a bank that was the assignee of a mortgage, alleging that the mortgage, the monthly payment of which was approximately $600 more than the plaintiffs' total monthly income, violated the Predatory Home Loan Practices Act, G. L. c. 183C (act), the judge erred in granting summary judgment in favor of the bank, where the bank, as the party seeking summary judgment, failed to meet its burden of showing that the loan did not constitute a high-cost home mortgage loan within the meaning of the act, i.e., that the points and fees charged by the lender did not exceed five per cent of the total loan amount. [782-785]

In a civil action brought by plaintiff homeowners against a bank that was the assignee of a mortgage, alleging that the mortgage, the monthly payment

[1]Peter Drakopoulos.

[2]On behalf of the holders of the Credit Suisse First Boston Mortgage Securities Corp., Home Equity Pass-Through Certificates, Series 2007-1.

[3]Select Portfolio Servicing, Inc.

[4]Orlans/Moran, the law firm that handled the foreclosure, had also been a named defendant. Following a successful motion to dismiss the claims against it, which the plaintiffs do not challenge, it is not a party to this appeal.

of which was approximately $600 more than the plaintiffs' total monthly income, violated G. L. c. 93A, the judge erred in granting summary judgment in favor of the bank, where the fact that the plaintiffs' mortgage had a fixed interest rate did not, standing alone, remove it from the purview of liability of G. L. c. 93A, and genuine issues of material fact existed whether the lender should have recognized at the outset that the plaintiffs were unlikely to be able to repay the loan. [785-787]

In a civil action brought by plaintiff homeowners against a bank that was the assignee of a mortgage, alleging that the mortgage, the monthly payment of which was approximately $600 more than the plaintiffs' total monthly income, was unconscionable, the judge erred in granting summary judgment in favor of the bank, where the bank did not establish the absence of issues that properly belonged to the trier of fact. [787-788]

In a civil action brought by plaintiff homeowners against a bank that was the assignee of a mortgage, alleging that the mortgage, the monthly payment of which was approximately $600 more than the plaintiffs' total monthly income, violated the Borrower's Interest Act, G. L. c. 183, § 28C, the judge erred in granting summary judgment in favor of the bank, where a triable issue of material fact existed whether the refinancing of an earlier loan to the plaintiffs was in their interest. [788-790]

This court declined to reach an issue where no trial court judge had had the opportunity to rule on the issue. [790]

CIVIL ACTION commenced in the Superior Court Department on May 28, 2009.

The case was heard by *Robert A. Cornetta*, J., on motions for summary judgment.

The Supreme Judicial Court granted an application for direct appellate review.

*Paul R. Collier, III* (*Pamela A. Lebowitz & Max Weinstein* with him) for the plaintiffs.

*Peter F. Carr, II*, for the defendants.

*Martha Coakley*, Attorney General, & *Glenn Kaplan, Aaron Lamb, & Gabriel O'Malley*, Assistant Attorneys General, for the Commonwealth, amicus curiae, submitted a brief.

LENK, J. In 2006, the plaintiffs, Susanne and Peter Drakopoulos,[5] refinanced their family home in Haverhill through Aegis Lending Corporation (lender), entering into a stated income home mortgage loan secured by a first mortgage on the home.[6]

---

[5]Since they share a last name, we refer to husband and wife Susanne and Peter Drakopoulos by their first names.

[6]We acknowledge the amicus brief of the Attorney General on behalf of the Commonwealth.

The total monthly payment on this loan proved to be approximately $600 greater than the plaintiffs' total monthly income. Less than six months after the mortgage was funded, it was sold and assigned to the defendant U.S. Bank National Association (bank) as trustee of the Credit Suisse First Boston Mortgage Securities Corp., Home Equity Pass-Through Certificates, Series 2007-1 (trust). The loan was serviced by the defendant Select Portfolio Servicing, Inc. (servicer). The plaintiffs fell behind in their payments and defaulted on the loan; in November, 2008, the bank foreclosed on the mortgage.

The plaintiffs thereafter brought this action, asserting, inter alia, violations of the Predatory Home Loan Practices Act, G. L. c. 183C (act); the Consumer Protection Act, G. L. c. 93A; and the Borrower's Interest Act, G. L. c. 183, § 28C. The plaintiffs also asserted that the loan was unenforceable because it was unconscionable, and they sought damages and rescission for predatory lending practices. A Superior Court judge granted the defendants' motions for summary judgment on all claims, based in large part on the ground that the defendants, as assignees, had no liability for the acts of the lender. The plaintiffs appealed. Because we conclude that the bank is not shielded from liability as a matter of law by virtue of its status as an assignee, and because it has not established the absence of material issues of disputed fact entitling it to judgment on any individual claim, the entry of summary judgment in its favor must be reversed. Because the servicer has not been shown to be an assignee, however, and because the plaintiffs offer no alternative basis on which the servicer might be held liable, we affirm the entry of summary judgment as to it.

1. *Standard of review.* "In considering a motion for summary judgment, we review the evidence and draw all reasonable inferences in the light most favorable to the nonmoving party." *Premier Capital, LLC* v. *KMZ, Inc.,* 464 Mass. 467, 474-475 (2013). "Because our review is de novo, we accord no deference to the decision of the motion judge." *DeWolfe* v. *Hingham Ctr., Ltd.,* 464 Mass. 795, 799 (2013) (*DeWolfe*). The defendants, as the moving parties, "have the burden of establishing that there is no genuine issue as to any material fact and that they are entitled to judgment as a matter of law." *Id.* "Once the

moving party establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts establishing the existence of a material fact in order to defeat the motion." *SCA Servs., Inc.* v. *Transportation Ins. Co.*, 419 Mass. 528, 531 (1995).

2. *Background.* a. *Facts.* We summarize the largely undisputed facts in the summary judgment record, viewed in the light most favorable to the plaintiffs, reserving certain facts for later discussion. The plaintiffs owned a house in Haverhill, which Susanne inherited from her mother. Prior to closing on the mortgage loan at issue, the plaintiffs had several times borrowed against the equity in their home. Approximately nine months prior to the subject refinancing, the plaintiffs had obtained a thirty-year adjustable rate mortgage in the principal amount of $155,000, with a base interest rate of 9.24 per cent, for an initial three-year period and monthly payments of $1,224.

In the early fall of 2006, a representative of the lender visited the plaintiffs' home, at their request, and obtained from them income information, including Internal Revenue Service Forms W-2 and wage stubs from Peter's employer, showing that Peter earned approximately $1,900 each month as a shipper and receiver at a warehouse facility. The lender was made aware that Susanne did not have a job.[7] The loan application, which the lender prepared and the plaintiffs signed that day, however, listed Peter as having a monthly income from wages of $5,900, and set forth a proposed monthly mortgage payment of $2,573.02. The lender processed the loan as a stated income loan,[8]

---

[7]While the plaintiffs apparently have graduated from high school and can read and understand English, Susanne has suffered since the age of two from a seizure disorder and related temporal lobe damage, has an intelligence quotient of sixty-six, third- to fourth-grade equivalent reading and word recognition, and long-term memory and nonverbal reasoning abilities in the borderline range. Peter appears to suffer from bipolar disorder.

[8]Unlike a fully documented loan, which requires verification of income and assets, a stated income loan "involves little verification [and] is based largely on the borrowers' credit score and asserted income." See *Frappier* v. *Country-wide Home Loans*, 645 F.3d 51, 53 (1st Cir. 2011). Cf. *Commonwealth* v. *Fremont Inv. & Loan*, 452 Mass. 733, 736 & n.7 (2008), discussing Commonwealth *vs.* Fremont Inv. & Loan, Mass. Super. Ct., No. 07-4373-BLS1 (Feb. 26, 2008), modified in part (Mar. 31, 2008) (in stated income loan, "the borrower was permitted to state his income without having to provide the

notwithstanding the receipt of documented borrower income information.

The plaintiffs maintain that they were unaware of the interest rate on the loan, the amount of the monthly payments, and the nature of the mortgage loan. They asserted in deposition testimony that they were rushed to sign the loan documents, not given an opportunity to read them, and told to "just sign the documents." They maintained that they did not know anything about this type of loan, were never informed that they had received one, were not aware that Peter's income was inflated on the loan application, and were not informed that such loans come with a higher interest rate than loans based on fully documented income.

The lender's underwriting income standards at the time required that the stated income "must be reasonable for the profession." The plaintiffs submitted evidence that Peter's stated income of $5,900 was over 170 per cent higher than the wage earned by the ninetieth percentile of shippers and receivers. The lender's underwriting reviewer, who conducted a review on the day of the closing, noted "PAYMENT SHOCK CONCERN: Proposed housing payment is greater than 150 percent of current housing payment. Borrower must demonstrate ability to handle increased payments." Nothing in the record indicates that the lender required the plaintiffs to make such a showing.

---

usual verifying documentation, such as income tax returns, W-2s, or pay stubs . . . . Since there was a substantially greater risk that the borrower had inflated his income with 'stated-income' loans, the borrower paid a higher interest rate than for the documented loans").

The plaintiffs submitted affidavits from Thomas A. Tarter and Carolyn Couillard, both of whom attest to having years of experience in the residential mortgage industry. Tarter indicated that stated income loans "are considered appropriate only for borrowers whose income is not reasonably susceptible to normal verification procedures . . . . [W]here the [b]orrower is a wage-earner, as Mr. Drakopoulos was, and his entire income is verifiable from his W-2, wage stubs and income tax returns, the only purposes served by processing a mortgage on a 'stated income' basis are to inflate the [b]orrower's income to enable approval of an objectively unaffordable loan and to increase the interest rate on that loan." Couillard opined, "If [the mortgage] was a Stated Income product, it was misused since this product was meant for a self-employed borrower whose income was difficult to calculate not an hourly employee whose income was quite easy to discern from documents readily available to the borrower such as W2's and pay stubs."

The closing took place on October 26, 2006. The lender provided the plaintiffs a loan in the amount of $249,000, with a fixed interest rate of 10.315 per cent, secured by a first mortgage on their home. The monthly payment on the loan was $2,573.02, over $600 more than the plaintiffs' total monthly income. After paying off their existing mortgage and other indebtedness, the transaction left the plaintiffs in receipt of $73,532.31.

An apparent affiliate of the lender, Aegis Mortgage Corporation,[9] acted as a loan originator for the trust. The plaintiffs' mortgage and note were sold and assigned to the bank, as trustee for the trust, on April 26, 2007; the assignment was duly recorded on April 29, 2008. The bank arranged for the servicer to service the plaintiffs' loan. After defaulting on their loan payments, on May 2, 2008, the plaintiffs entered into a forbearance agreement with the servicer, but ultimately were unable to comply with its terms. In November, 2008, the bank foreclosed on the mortgage and sold the property at auction.

b. *Prior proceedings.* On May 28, 2009, the plaintiffs filed their complaint in the Superior Court against the bank and the servicer, seeking money damages and rescission of the 2006 mortgage loan. The complaint asserted six claims: (1) wrongful foreclosure in violation of G. L. c. 244, § 35A, and G. L. c. 183, § 21; (2) violation of the Predatory Home Loan Practices Act, G. L. c. 183C; (3) violation of the Consumer Protection Act, G. L. c. 93A; (4) violation of the Borrower's Interest Act, G. L. c. 183, § 28C; (5) unconscionability; and (6) negligent and intentional infliction of emotional distress.

The parties stipulated to dismissal of the claim for wrongful foreclosure, and the defendants' first motion for summary judgment was allowed on the claim for intentional infliction of emotional distress; the plaintiffs do not appeal from that decision. Following the completion of discovery, the defendants filed their second motion for summary judgment on the remaining four claims, and the plaintiffs filed a cross motion for partial

[9]Nine months after the origination of the plaintiffs' loan, the Commissioner of Banks revoked both Aegis Mortgage Corporation's and Aegis Lending Corporation's licenses to do business in the Commonwealth. In August, 2007, each filed for bankruptcy protection.

summary judgment. The judge granted the defendants' motion, denied the plaintiffs' cross motion, and denied the plaintiffs' motion to alter or amend the judgment pursuant to Mass. R. Civ. P. 59 (e), 365 Mass. 827 (1974). The plaintiffs appealed, and we allowed their petition for direct appellate review.

3. *Discussion.* a. *Assignee liability.* The defendants maintain on appeal, as they did in their motion for summary judgment, that they are entitled to judgment as a matter of law on all four remaining claims primarily because they are not liable for the lender's allegedly predatory lending practices during the origination of the loan, prior to its assignment. While the Predatory Home Loan Practices Act (act), G. L. c. 183C, provides that "[a]ny person who purchases or is otherwise assigned a high-cost home mortgage loan shall be subject to all affirmative claims and any defenses with respect to the loan that the borrower could assert against the original lender or borrower of the loan," G. L. c. 183C, § 15 (*a*), the defendants maintain that the plaintiffs cannot establish that the loan at issue is a "high-cost home mortgage loan."[10]

Concluding that the plaintiffs' loan did not qualify as a high-

---

[10]The assignee of a high-cost home mortgage loan can avoid the Predatory Home Loan Practices Act's (act's) imposition of assignee liability if it demonstrates by a preponderance of the evidence that it:

"(1) has in place at the time of purchase or assignment of the subject loans, policies that expressly prohibit its purchase or acceptance of assignment of any high-cost home mortgage loans;

"(2) requires by contract that a seller or assignor of home loans to the purchaser or assignee represents and warrants to the purchaser that either (i) the seller or assignor will not sell or assign any high-cost home mortgage loans to the purchaser or assignee or (ii) that the seller or assignor is a beneficiary of a representation and warranty from a previous seller or assignor to that effect; and

"(3) exercises reasonable due diligence at the time of purchase or assignment of home loans or within a reasonable period of time after the purchase or assignment of the home loans, intended by the purchaser or assignee to prevent the purchaser or assignee from purchasing or taking assignment of any high-cost home mortgage loans; provided, however, that reasonable due diligence shall provide for sampling and shall not require loan by loan review."

G. L. c. 183C, § 15 (*a*). On this record, U.S. Bank National Association (bank) has not made such a showing.

cost home mortgage loan, the judge allowed the defendants' motion with respect to the act, a decision that we view as being unwarranted on this record and that, accordingly, must be reversed. See part 3.b, *infra*. To the extent that the bank may thus have liability as an assignee by virtue of the act, it would extend to "all affirmative claims and defenses with respect to the loan" that the plaintiffs could assert against the lender, including the statutory claims asserted under the Consumer Protection Act, G. L. c. 93A; and the Borrower's Interest Act, G. L. c. 183, § 28C, as well as the affirmative defense of unconscionability.[11] Given this, allowing summary judgment in the bank's favor on those three claims, to the extent that it is based on the bank's status as assignee, is premature. However, because nothing in the record permits us to conclude that the servicer was an assignee of the loan and would have liability as such, and because the plaintiffs failed to establish any other basis for the servicer's liability, summary judgment in its favor correctly was allowed.[12]

b. *Predatory Home Loan Practices Act.* The act prohibits lenders from making "high-cost home mortgage loan[s]" unless

---

[11]While we have not previously had the opportunity to construe this provision of the act, the plain language of the provision, subjecting assignees to "all" affirmative claims, not just claims brought under the act, see G. L. c. 183C, § 15 (*a*), demonstrates that the Legislature intended a broad scheme of liability for assignees of high-cost home mortgage loans. This is in harmony with the analogous provision of the Federal Truth in Lending Act (TILA), 15 U.S.C. § 1641(d)(1) (2006), which has been read to make "assignees [of high-cost home mortgage loans] subject to all claims and defenses, whether under [TILA] or other law, that could be raised against the original lender." See *Cooper* v. *First Gov't Mtge. & Investors Corp.*, 238 F. Supp. 2d 50, 55 (D.D.C. 2002).

[12]It is undisputed that the plaintiffs' loan was assigned from the Mortgage Electronic Registration Systems to the bank by way of an assignment dated April 26, 2007, and therefore that the bank is an assignee of the plaintiffs' loan. It is also undisputed that "[t]he authority of [Select Portfolio Servicing, Inc. (servicer),] to take any action with regard to the [plaintiffs'] property arises solely from the authority of and its relationship with [the bank]." Suzanne Johnstone, a document control officer for the servicer, agreed at a deposition that with regard to the plaintiffs' property, "the only entity with whom [the servicer] has a legal relationship authorizing it to take action is the trust and the [bank]." Based on the record before us, the servicer appears to have been connected to the plaintiffs' loan only through its work on behalf of the bank. Its role was limited to ordinary duties carried out by servicers.

certain statutory criteria are met.[13] The act defines a "[h]igh-cost home mortgage loan" as "a home mortgage loan that meets [one] of the following conditions:—

"(i) the annual percentage rate at consummation will exceed by more than [eight] percentage points for first-lien loans, or by more than [nine] percentage points for subordinate-lien loans, the yield on United States Treasury securities . . . .

"(ii) Excluding either a conventional prepayment penalty or up to [two] bona fide discount points, the total points and fees exceed the greater of [five] per cent of the total loan amount or $400 . . . ."

G. L. c. 183C, § 2.

The judge concluded that the plaintiffs' loan did not satisfy the first condition. On appeal, the plaintiffs do not contest this determination, but maintain that the loan qualifies as a high-cost home mortgage loan pursuant to the second condition, since the points and fees charged by the lender exceeded five per cent of the total loan amount. Although it was raised in the plaintiffs' cross motion for partial summary judgment, the motion judge did not address this argument.

The total amount of the plaintiffs' loan was $249,000; five per cent of that amount is $12,450. The record contains two documents showing differing calculations of the charges assessed to the plaintiffs for origination of the loan. The first, a United States Department of Housing and Urban Development Settlement Statement (HUD statement), states the fees to be $14,048.04 — in excess of the five per cent mark. The second document, entitled "Massachusetts High Cost Worksheet" (high

---

[13]"A creditor may not make a high-cost home mortgage loan without first receiving certification from a counselor with a third-party nonprofit organization approved by the United States Department of Housing and Urban Development, a housing financing agency of this [S]tate, or the regulatory agency which has jurisdiction over the creditor, that the borrower has received counseling on the advisability of the loan transaction." G. L. c. 183C, § 3. Additionally, "[a] lender shall not make a high-cost home mortgage loan unless the lender reasonably believes at the time the loan is consummated that [one] or more of the obligors, will be able to make the scheduled payments to repay the home loan . . . ." G. L. c. 183C, § 4.

cost worksheet), states that the total fees assessed to the plaintiffs were $12,267.94 — $182.06 less than five per cent of the loan. The reason for the difference in these two calculations is readily discernible. The act specifies which costs charged to borrowers must be considered as a "point" or "fee." See G. L. c. 183C, § 2. The HUD statement, which is not prepared for purposes of compliance with the act, lists as fees several charges which are not defined as points or fees under the terms of the act.[14] The high cost worksheet does not include these charges, thereby accounting for the significant gap in the total fees stated in the two documents. The plaintiffs maintain that the calculation of fees charged on the high cost worksheet is nonetheless incorrect because it omits a charge of $215 for a title examination; had that charge been included, the points and fees would have exceeded the $12,450 (five per cent) threshold.

Ordinarily, the fee assessed for a title examination need not be included as a point or fee under the provisions of the act, so long as it is "*bona fide* and reasonable in amount" (emphasis in original). 209 Code Mass. Regs. § 32.04(3)(g) (2010). The plaintiffs assert, however, that the lender never provided any title examination services, and thus that the $215 charge was neither bona fide nor reasonable. Accordingly, the plaintiffs maintain that the fee should be included in the calculation of points and fees.

Rather than proffer evidence showing that a title examination was completed, and hence that the fee is bona fide, the bank instead asserts that the plaintiffs have provided no evidence to the contrary. As the party seeking summary judgment, however, the bank "bears the burden of affirmatively demonstrating that there is no triable issue of fact." *Ng Bros. Constr., Inc.* v. *Cranney*, 436 Mass. 638, 644 (2002). See *Lev* v. *Beverly Enterprises-Mass., Inc.*, 457 Mass. 234, 237 (2010) (moving party "bears the burden of affirmatively demonstrating the absence of a triable issue").

Even were we to assume that the bank could somehow satisfy its burden merely by relying on the plaintiffs' asserted failure to establish that no title examination occurred, its characterization

---

[14]Those charges include title insurance premiums, fees for flood certification, and recording fees. See G. L. c. 183C, § 2.

of the record in this regard is inaccurate. The HUD statement lists Advantage Equity Service (Advantage) as the entity paid to perform the title examination. The attorney hired by Advantage to conduct the closing testified during a deposition, "When it came to refinancings, it was all about the insurance. There [were] no title-related services I needed to provide." While this statement alone may not be conclusive on the point, it supports the plaintiffs' claim that Advantage did not perform a title examination and the reasonable inference, which we draw in the plaintiffs' favor, that no title examination was done.

It was incumbent on the bank to counter this with evidence that someone actually did the title work for which the plaintiffs were charged $215. Instead, the record is devoid of any documentary evidence demonstrating that the examination occurred, and of any deposition testimony averring that it did. Therefore, whether the title examination was conducted, i.e., is bona fide, is an issue of disputed material fact. The bank, having failed to meet its burden of showing the absence of a triable issue, is not entitled to summary judgment on the claim alleging a violation of the act. See *DeWolfe, supra.*

c. *Consumer Protection Act, G. L. c. 93A.* The plaintiffs maintain that the lender violated G. L. c. 93A by committing unfair or deceptive acts in originating the mortgage. The judge granted the bank's motion for summary judgment motion as to the G. L. c. 93A claim in part based on his conclusion that "since the plaintiffs' loan was a fixed rate loan, they are afforded no relief under the theory of presumptively unfair/predatory loans as enunciated in *Commonwealth* v. *Fremont [Inv. &] Loan,* 452 Mass. 733 (2008)" (*Fremont*).[15] Because the judge's reading of that case is unduly narrow, the entry of summary judgment

---

[15]The judge held also that "any suggestion that these defendants may have *negligently* inflicted emotional distress also fails since G. L. [c.] 93A claims require *intent* on the part of an actor to proceed" (emphasis in original). It is unclear whether the judge understood all G. L. c. 93A claims to require intent, or only those claims predicated on the negligent infliction of emotional distress. To the extent it is the former, such a conclusion would be erroneous. We have stated repeatedly that negligence, where it results in an unfair or deceptive act, may give rise to liability under G. L. c. 93A. See *Aspinall* v. *Philip Morris Cos.,* 442 Mass. 381, 394 (2004) ("A successful G. L. c. 93A action based on deceptive acts or practices does not require proof . . . that the defendant intended to deceive the plaintiff, see *Swanson* v. *Bankers Life Co.,* 389 Mass.

in favor of the bank on the plaintiffs' G. L. c. 93A claim cannot stand on this basis.

In *Fremont*, we held that a lender may be liable under G. L. c. 93A for "the origination of a home mortgage loan that the lender should recognize at the outset that the borrower is not likely to be able to repay." *Id.* at 748-749. In that case, the judge determined that the mortgage loans offered were unfair based on four characteristics, among them that the loans had adjustable rates and an introductory rate period of three years or less. *Id.* at 739.

Here, the judge determined that the plaintiffs' loan was not predatory under the *Fremont* analysis because it was a fixed-rate loan, and thus did not meet one of *Fremont*'s enumerated characteristics. Nothing in our decision in *Fremont*, however, was intended to suggest that the universe of predatory home loans is limited only to those meeting the four criteria present in that case. Rather, "[t]he holding of *Fremont* was that [G. L. c.] 93A prohibits 'the origination of a home mortgage loan that the lender should recognize at the outset that the borrower is not likely to be able to repay.' " *Frappier* v. *Countrywide Home Loans, Inc.*, 645 F.3d 51, 56 (1st Cir. 2011), quoting *Fremont*, *supra* at 748-749.

Accordingly, that the plaintiffs' mortgage had a fixed interest rate does not, standing alone, remove it from the purview of liability pursuant to G. L. c. 93A. Rather, the question is whether the lender should have recognized at the outset that the plaintiffs were unlikely to be able to repay the loan. The answer to this question is hardly a matter of undisputed material fact. See *De-Wolfe, supra.* To the contrary, the record contains undisputed documentation that the lender artificially inflated Peter's income to $5,900 per month, despite having written documentation that he earned only $1,900 per month, and that, while in possession of documents showing Peter's monthly and annual income, the

345, 349 [1983], or even knowledge on the part of the defendant that the representation was false"); *Maillet* v. *ATF-Davidson Co.*, 407 Mass. 185, 193-194 (1990), quoting *Linthicum* v. *Archambault*, 379 Mass. 381, 388 & n.12 (1979) ("it is not a defense to a [G. L.] c. 93A claim that the defendant's conduct was negligent rather than intentional . . . . Neither intent to engage in an unlawful act nor knowledge of its unlawfulness is required in order to establish liability").

lender issued a loan with monthly payments exceeding the plaintiffs' total monthly income. Accordingly, a determination whether the lender acted unfairly or deceptively, in violation of G. L. c. 93A, when originating the plaintiffs' loan is properly left to the finder of fact.[16]

d. *Unconscionability.* The plaintiffs allege that their mortgage was unconscionable because the lender was in a superior bargaining position and placed them "in an unaffordable mortgage loan that was doomed to foreclosure from the start." "Unconscionability must be determined on a case-by-case basis, with particular attention to whether the challenged provision could result in oppression and unfair surprise to the disadvantaged party . . . ." *Waters* v. *Min Ltd.*, 412 Mass. 64, 68 (1992). Among the factors that could render a contract unconscionable are "gross disparity in the consideration," "[h]igh pressure sales tactics and misrepresentations," and "[i]f the sum total of the provisions of a contract drive too hard a bargain." *Id.*

The judge concluded that the defendants' motion for summary judgment on this claim should be allowed because "there

---

[16]Because the plaintiffs' surviving claim under the act subjects the bank to potential liability for the plaintiffs' G. L. c. 93A claim due to its status as an assignee, see part 3.a, *supra*, the bank's argument that its assignee status entitles it to summary judgment on the plaintiffs' G. L. c. 93A claim necessarily fails. Moreover, as a matter of common law, assignees are not shielded from liability under G. L. c. 93A by virtue of their assignee status.

It is well established that an assignee "stands in no better position than the assignor, and any defence which the defendant could raise against the latter may also be raised against the former." *Quincy Trust Co.* v. *Pembroke*, 346 Mass. 730, 732 (1964). Where an assignee played no part in the unfair or deceptive acts of an assignor, principles of assignee liability ordinarily will not render the assignee liable for affirmative damages for those acts. See *Ford Motor Credit Co.* v. *Morgan*, 404 Mass. 537, 545 (1989) ("The common law principle that the assignee stands in the assignor's shoes means only that the debtor can raise the same defenses against the assignee as he could have raised against the assignor. . . . It has never been interpreted to mean that the assignee will be liable for all the assignor's wrongs").

Even where the unfair or deceptive acts were committed wholly by an assignor, based on common-law principles of assignee liability, assignees may be liable under G. L. c. 93A for equitable remedies such as cancellation of a debt or rescission of a contract. See *id.* at 540, 545-546 (judge did not err in ordering counterclaims, including counterclaim brought under G. L. c. 93A, § 2, to be used only defensively to extinguish assignee creditors' claim for remaining debt).

is no evidence from which a finder of fact could determine that the transaction was unconscionable." In reaching this conclusion, the judge determined that the plaintiffs were "reasonably sophisticated" and "knew what they were doing." Such comments indicate that the judge inappropriately weighed the evidence and made credibility assessments adverse to the nonmoving party. See *O'Connor* v. *Redstone*, 452 Mass. 537, 550 (2008) ("In deciding whether summary judgment is appropriate . . . . [t]he judge views the evidence indulgently in favor of the nonmoving party and without considering witness credibility, weighing the evidence, or making findings of fact").

It is undisputed that Susanne suffered from significant intellectual disability, see note 7, *supra*, and evidence in the record suggests that Peter suffered from bipolar disorder.[17] The plaintiffs assert that they were rushed to sign the documents at closing and were unaware of the loan interest rate, the amount of their monthly payments, or the nature of the mortgage loan. The record demonstrates that the lender artificially inflated Peter's salary on underwriting documents, notwithstanding documents in its possession, such as tax forms from Peter's employer, and disregarded concerns expressed by its own underwriters concerning the plaintiffs' ability to repay the loan based on their actual income. The terms of the loan itself, which required monthly payments that were roughly $600 more than the plaintiffs' total monthly income, also raise a question as to unconscionability that belongs properly to the trier of fact. Because the bank has not established the absence of a triable issue as to the plaintiffs' claim of unconscionability, it is not entitled to summary judgment on this claim.[18]

e. *Borrower's Interest Act.* The Borrower's Interest Act, G. L. c. 183, § 28C, prohibits lenders from originating certain

---

[17] A psychiatrist retained by the defendants, who conducted a court-ordered examination of Peter on the defendants' motion, determined that he suffered from bipolar disorder and that "the October 2006 refinancing itself was an overt manifestation of an active manic phase."

[18] As with the plaintiffs' G. L. c. 93A claim, the bank's argument that its assignee status precludes it from liability on the plaintiffs' unconscionability claim is not tenable in light of the plaintiffs' surviving claim under the act. See part 3.a., *supra*. Additionally, common-law principles of assignee liability mandate that a party to a contract be able to raise the contractual defense of unconscionability, see *St. Fleur* v. *WPI Cable Sys./Mutron*, 450 Mass. 345,

home refinancing loans that are not in the borrower's interest. The statute provides:

"A lender shall not knowingly make a home loan if the home loan pays off all or part of an existing home loan that was consummated within the prior 60 months or other debt of the borrower, unless the refinancing is in the borrower's interest."

G. L. c. 183, § 28C (*a*). The statute also mandates that

"[t]he 'borrower's interest' standard shall be narrowly construed, and the burden is upon the lender to determine and to demonstrate that the refinancing is in the borrower's interest."[19]

It is undisputed that the loan originated by the lender, refinancing a home loan consummated roughly nine months earlier, required the plaintiffs to make monthly payments that exceeded their total monthly income. Given this, we cannot say there is

350 (2008), irrespective of whether it is raised against the assignor or assignee. See *Quincy Trust Co.* v. *Pembroke, supra.* A contract that is unenforceable because it is unconscionable does not become enforceable simply by virtue of being assigned from one party to another.

[19]The Borrower's Interest Act "does not specifically set forth a remedy for a violation of any of its provisions, but nevertheless suggests that a borrower would be entitled to costs and attorney's fees for successfully bringing such an action against a lender." *In re DiMare*, 462 B.R. 283, 304 (Bankr. D. Mass. 2011), citing G. L. c. 183, § 28C (*b*). The Borrower's Interest Act also does not create explicitly a private right of action by which borrowers may assert alleged violations, and we have not considered previously whether the Legislature intended to provide such a right. See *Salvas* v. *Wal-Mart Stores, Inc.*, 452 Mass. 337, 373 (2008) ("Where the Legislature has not expressly provided for a private right of action, we may nonetheless infer an implied private right of action unless the Legislature explicitly prohibits us from doing so"). Because neither party raised or briefed the issue, and because the claimed violation of the Borrower's Interest Act may be litigated as a predicate to the plaintiffs' G. L. c. 93A claim, we leave for another day the question whether the Borrower's Interest Act creates a private right of action. See *Whitehall Co. Ltd.* v. *Merrimack Valley Distr. Co.*, 56 Mass. App. Ct. 853, 858 (2002) ("Violation of a specific statute that does not itself permit private recovery may give rise to a private claim under [G. L.] c. 93A if the violation amounts to an unfair method of competition or an unfair or deceptive practice independently prohibited by G. L. c. 93A, § 2, and if recovery under [G. L.] c. 93A is compatible with the objectives and enforcement mechanisms the underlying statute contains").

no triable issue as to whether the refinancing was in the plaintiffs' interest.[20]

f. *Jury trial.* Finally, the plaintiffs ask us to address whether they are entitled to a trial by jury on their surviving claims. We decline to do so, since no Superior Court judge has yet had the opportunity to rule on the issue. See *Greco* v. *Probate & Family Court Dept.*, 422 Mass. 7, 9 (1996) (ordinarily "appellate review is not appropriate until there has been a final order, judgment, or decree").

4. *Conclusion.* The order granting judgment in favor of Select Portfolio Servicing, Inc., is affirmed. The order granting judgment in favor of U.S. Bank National Association is vacated and set aside. The matter is remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*

---

[20]As with the preceding claims, the bank's argument that it is entitled to summary judgment on the Borrower's Interest Act claim based on its assignee status must fail where the bank may face liability by virtue of the plaintiffs' claim under the act. See part 3.a, *supra.*

Where the act is not implicated, however, an assignee who took no part in the making of a home loan would not fall within the scope of liability of the Borrower's Interest Act, since its plain language concerns only lenders who "make a home loan." See *Commonwealth* v. *Jones*, 417 Mass. 661, 664 (1994) (where "the explicit language of the statute unambiguously manifests a legislative intent," the court is "not free to ignore or tamper with that clear expression"). Nonetheless, where an assignee in some way facilitates or encourages an assignor's making of a home loan, the remedial purpose of the Borrower's Interest Act is effectuated by placing such assignees within its ambit. See *Roberts* v. *Enterprise Rent-A-Car Co. of Boston*, 438 Mass. 187, 192 (2002), *S.C.*, 445 Mass. 811 (2006) ("we interpret consumer protection statutes broadly to effectuate their remedial purposes"); *Batchelder* v. *Allied Stores Corp.*, 393 Mass. 819, 822 (1985) (remedial statutes "entitled to liberal construction of [their] terms").