NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

15-P-359                                    Appeals Court


   ZVI CONSTRUCTION COMPANY, LLC  vs.  FRANKLIN LEVY & another.[1]


                        No. 15-P-359.

      Suffolk.    January 12, 2016. - October 6, 2016.

         Present:  Kafker, C.J., Cohen, & Blake, JJ.


Notice, Timeliness.  Conversion.  Evidence, Privileged
     communication.  Privileged Communication.  Waiver.
     Attorney at Law, Attorney-client relationship.  Practice,
     Civil, Notice of appeal, Appeal, Complaint, Waiver.  Fraud.



     Civil action commenced in the Superior Court Department on
January 28, 2013.

     A motion to dismiss, a motion to strike, and a motion to
compel discovery were heard by Christine M. Roach, J.; the
remaining issues were heard by Janet L. Sanders, J., on motions
for summary judgment; and entry of separate and final judgment
was ordered by Kenneth W. Salinger, J.


     Richard E. Briansky for the plaintiff.
     Christopher R. O'Hara (Ian J. Pinta with him) for the
defendants.


     COHEN, J.  The plaintiff, ZVI Construction Company, LLC

(ZVI), brought suit against the defendants, Attorney Franklin

_____

     [1] Lawson & Weitzen, LLP.

Levy and the law firm of Lawson & Weitzen, LLP (L & W), claiming that they had engaged in misrepresentation and other wrongdoing in connection with a mediated settlement between ZVI and the defendants' clients:  The Upper Crust, LLC, and its affiliated entities (collectively, The Upper Crust), and two of its principals, Brendan Higgins and Joshua Huggard.  As a result of orders entered by two different Superior Court judges, all of ZVI's claims against the defendants were dismissed, and ZVI filed a notice of appeal.  Despite the fact that ZVI's notice of appeal was filed before the entry of a separate and final judgment and, hence, was premature, we exercise our discretion to decide this matter.  After consideration of the arguments presented, we affirm.

1.  Background.[2]  Except where indicated, the following facts are not in dispute.  Brendan Higgins, Joshua Huggard, and Jordan Tobins were members and managers of numerous limited liability companies operating a small chain of pizzerias known as The Upper Crust.  On April 5, 2012, Higgins, Huggard, and The Upper Crust, all of whom were represented by Levy and his firm, L & W, filed a civil lawsuit against Tobins.  In or around July,

---

[2] ZVI's brief and the record include many communications that were ruled protected from disclosure by the attorney-client privilege.  Given our agreement with that ruling, we have not taken these documents into account in reaching our decision.  Even if we had done so, however, they would not have changed the conclusions reached herein.

2012, a settlement was reached in that action and documented in a memorandum of understanding (Tobins MOU). The Tobins MOU provided, inter alia, as follows:

> "Tobins will pay or cause to be paid, by cash, bank check or wired funds $250,000 to the Upper Crust, said payment to be made no later than October 1, 2012 (the 'Closing Payment') and shall be made to an account or payee as designated by the Upper Crust in writing" (emphasis supplied).

Meanwhile, on April 6, 2012, ZVI had filed its own lawsuit against The Upper Crust, Higgins, Huggard, and Tobins, alleging that they had failed to pay ZVI for construction work performed on The Upper Crest restaurants (collection action). In the collection action, Higgins, Huggard, and The Upper Crust again were represented by Levy and L & W.

The parties to the collection action subsequently agreed to mediate their dispute. The mediation took place on September 6, 2012, at which time all parties to the collection action, their respective legal counsel, and the mediator executed a mediation agreement that provided, in pertinent part:

> "The parties further agree that the mediation, including all communications, documents and other materials, used during said mediation, including all communications between and among the parties and their counsel, shall be confidential and shall not be used for any purpose other than for said mediation" (emphasis supplied).

Prior to the mediation, ZVI was aware that The Upper Crust had limited assets and significant debt, was under government

investigation for unfair labor practices, and was dealing with significant internal management issues. ZVI also had been informed by The Upper Crust's legal counsel that The Upper Crust might file for bankruptcy. At the mediation, the parties to the collection action reached a settlement that was memorialized in a written agreement (ZVI settlement), which provided, among other things, that:

> "On or before October 3, 2012, Upper Crust LLC shall pay to the plaintiff [ZVI] the sum of $250,000, which funds are being paid by Jordan S. Tobins to Upper Crust LLC in satisfaction of his obligation under his separate memorandum of understanding with Huggard, Higgins and the Upper Crust LLC. In the event that said Tobins fails to make the $250,000 payment, this agreement shall be null and void." (Emphasis supplied.)

The ZVI settlement did not contain an escrow provision or otherwise call for or obligate Levy or L & W to act as escrow agents. Levy and L & W were never specifically asked, nor did they expressly agree, to act as an escrow agent for ZVI's benefit. They also were not parties or signatories to the ZVI settlement.

In the present case, the central dispute concerns what occurred at the mediation. ZVI alleges that prior to the execution of the ZVI settlement, both Tobins and ZVI proposed that the $250,000 due under the Tobins MOU be paid directly by Tobins to ZVI; however, according to ZVI, Levy insisted that the money be paid to The Upper Crust first and then delivered to

ZVI.  ZVI further alleges that, in order to induce both Tobins and ZVI to execute the settlement, Levy "represented that he would pay the funds to ZVI."  ZVI claims to have executed the settlement in reliance upon this representation.  Levy and L & W deny all of the above allegations.

Approximately ten days after the mediation, on September 17, 2012, Tobins's legal counsel sent Levy an electronic mail message (e-mail), in which he set forth "a list of issues that we'll need to address," including the following regarding the payment due under the Tobins MOU:  "Payment ($250k on or before October 1 -- to you to pay ZVI)."  The following day, Levy responded by e-mail and, regarding that specific issue, wrote, "I will send you my firm's escrow wire info."

Subsequently, on Friday, September 28, 2012, an entity named Ditmars, Ltd., acting on Tobins's behalf, wired the $250,000 due under the Tobins MOU to the Interest on Lawyers' Trust Account (IOLTA account) maintained by L & W.  Upon receipt of the funds, Levy, who was in Hong Kong at the time, sent his associate at L & W, Joshua Segal, an e-mail, directing him to "make sure the money is held and we do not release it to anyone until I give directions.  Especially note the money is not to be released to ZVI or [ZVI's legal counsel Richard] Briansky or anyone.  Very important.  Thanks."  Both Levy and Segal testified that Levy was concerned about having clear written

instructions from his client before the funds were released to anyone.

The same day, September 28, 2012, Dan Hurley, The Upper Crust's chief financial officer (CFO) and accountant, sent Levy an e-mail directing as follows:

"[H]ere is how I would like the 250,000 distributed from your IOLTA account.

"Murphy and King $64,644.00
"Lawson and Weitzen $21,447.28
"DiNicola, Seligson & Upton, LLP $9,246.26

"[T]hanks!!
"I will make sure your office has all the wire information to make these transfers."

Later that day, Hurley sent Segal an e-mail directing him to wire the balance of the $250,000, estimated to be $154,692.46, to The Upper Crust's payroll account, entitled the JJB Hanson Management Payroll Account. The next day, Saturday, September 29, 2012, Hurley forwarded yet another e-mail to Segal and Levy, summarizing his instructions regarding disbursement of the $250,000:

"Here is the . . . email I sent to Franklin [Levy] late yesterday afternoon with the amounts that need to go out. Please have John send these first thing Monday morning, if he can. I think Franklin may have confirmed this with you but if not, please verify with him. You will be leaving the $21,447.28 in the Lawson and Weitzen account for the August 31, 2012 invoice. On Monday John should send out 3 wires. Murphy and King, DiNicola, Seligson & Upton, LLP and JJB Manag[e]ment Hanson, Inc. which should be the remaining balance of the $250,000. [T]hat amount should be $154,662.46. Let me know if you [have] any questions. Thanks!!"

Two days later, on Monday, October 1, 2012, the $250,000 in funds were disbursed from L & W's IOLTA account as follows:

        $64,644.00 to Murphy and King
        $21,417.28 to Lawson & Weitzen
        $9,246.26 to DiNicola, Seligson & Upton, LLP
        $154,692.46 to JJB Hanson Management Payroll Account

The $21,417.28 sent to L & W was in payment of a bill for legal services, dated September 14, 2012, that had been sent to The Upper Crust.

Meanwhile, on September 20, 2012, Higgins, Huggard, and The Upper Crust had met with a bankruptcy attorney, Harold Murphy, and retained him and his law firm, Murphy & King, P.C. (Murphy & King).  On October 4, 2012, The Upper Crust and affiliated entities, represented by Murphy & King, filed a petition for bankruptcy under Chapter 11 of the United States Bankruptcy Code.  ZVI was never paid the $250,000 due under the ZVI settlement.

On January 28, 2013, with The Upper Crust entities in bankruptcy, ZVI initiated the present action, filing a verified complaint against Levy and L & W.  Subsequently, on March 12, 2013, ZVI filed an unverified amended complaint, which, among other things, added Higgins and Huggard as defendants.  Levy and L & W responded by filing two motions:  (1) a motion to strike all allegations in the amended complaint concerning a statement allegedly made by Levy at mediation, see Mass.R.Civ.P. 12(f),

365 Mass. 754 (1974); and (2) a motion to dismiss all counts against them in the amended complaint, see Mass.R.Civ.P. 12(b)(6), 365 Mass. 754 (1974). ZVI opposed both motions.

After a hearing, a judge of the Superior Court (first judge) issued a memorandum and order (1) allowing the motion to strike the alleged statement made at mediation, because its use was prohibited by the confidentiality provision in the mediation agreement, and (2) dismissing most, but not all, of the claims against Levy and L & W. Then, based on the allowance of the motion to strike and, to a large extent, on other, independent grounds detailed in the memorandum and order, the judge dismissed in their entirety the claims against Levy and L & W for aiding and abetting fraud (count V), misrepresentation (count VI), breach of an alleged escrow agreement (count VII), breach of fiduciary duty (count VIII), and conspiracy (count X). As for the remaining claims against Levy and L & W, the judge allowed the claims for tortious interference with contractual relations (count III), conversion (count IX), and violation of G. L. c. 93A, § 11 (count XII), to proceed, but only as to the $21,417.28 that was disbursed to L & W, and not as to the rest of the $250,000 that was disbursed to third parties from the IOLTA account.[3]

---

[3] On appeal, ZVI does not challenge the partial dismissal of counts III, IX, and XII.

Upon the completion of discovery, Levy and L & W filed a motion for summary judgment as to what remained of those three counts (III, IX, and XII).  See Mass.R.Civ.P. 56(c), as amended, 436 Mass. 1404 (2002).  ZVI opposed and filed a cross motion for summary judgment on what remained of the claim for conversion (count IX).  After a hearing, another judge of the Superior Court (second judge) issued a memorandum of decision and order (1) allowing Levy and L & W's motion and dismissing all remaining claims against them, and (2) denying ZVI's cross motion.  A judgment to that effect subsequently entered on January 5, 2015, and, on January 26, 2015, ZVI filed a notice of appeal.

2.  <u>Discussion</u>.  a.  <u>Premature notice of appeal</u>.  We first confront a threshold procedural issue.  Because there remained unresolved claims against Higgins and Huggard, and there was no final judgment, ZVI's notice of appeal was premature.  At oral argument, this procedural defect was called to the attention of the parties, who then returned to the trial court where another Superior Court judge (third judge) allowed their joint motion for the entry of a separate and final judgment.  See Mass.R.Civ.P. 54(b), 365 Mass. 820 (1974).  At that point, however, in order to perfect its appeal, ZVI should have filed a new notice of appeal.  This it did not do.

We nevertheless exercise our discretion to treat the appeal as properly before us.  See, e.g., Lewis v. Emerson, 391 Mass. 517, 518-520 (1984); Lawrence v. Lawrence Patrolmen's Assn., 56 Mass. App. Ct. 704, 706 n.4 (2002); Scannell v. Attorney Gen., 70 Mass. App. Ct. 46, 47 n.2 (2007).  We do so because the issues are of importance and have been fully briefed.  In addition, ZVI's claims against Higgins and Huggard have now been resolved.[4]

b.  Conversion.  ZVI contends that the second judge erred when, at the summary judgment stage, she dismissed what remained of the claim for conversion, i.e., the transfer of $21,417.28 from the IOLTA account to L & W.  Our review proceeds under well-established summary judgment standards.[5]  We conclude that

---

[4] We note that reaching the merits is consistent with decisions under the cognate Federal rule, which consider the subsequent entry of a separate and final judgment to cure a premature notice of appeal.  See Clausen v. Sea-3, Inc., 21 F.3d 1181, 1184 (1st Cir. 1994).  See also National Assn. of Bds. of Pharmacy v. Board of Regents of the Univ. Sys. of Ga., 633 F.3d 1297, 1306-1307 (11th Cir. 2011), and cases cited.  However, we express no opinion as to whether the Federal approach is suitable for Massachusetts and should be adopted here.

[5] "In considering a motion for summary judgment, we review the evidence and draw all reasonable inferences in the light most favorable to the nonmoving party.  Because our review is de novo, we accord no deference to the decision of the motion judge.  The defendants, as the moving parties, have the burden of establishing that there is no genuine issue as to any material fact and that they are entitled to judgment as a matter of law.  Once the moving party establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts establishing the existence of a material

Levy and L & W sustained their burden of establishing entitlement to judgment as a matter of law.

"The elements of conversion require that a defendant be proved to have 'intentionally or wrongfully exercise[d] acts of ownership, control or dominion over personal property to which he has no right of possession at the time.'" Grand Pac. Fin. Corp. v. Brauer, 57 Mass. App. Ct. 407, 412 (2003), quoting from Abington Natl. Bank v. Ashwood Homes, Inc., 19 Mass. App. Ct. 503, 507 (1985). Here, the premise of ZVI's argument is that the $250,000 was its property. As the second judge reasoned, however, even though the $250,000 was owed to ZVI under the ZVI settlement, the money was not held by the defendants for the benefit of ZVI; nor was it placed in an escrow account. Rather, it was held as client funds in an IOLTA account, where it belonged to and was under the exclusive dominion and control of The Upper Crust. See Mass.R.Prof.C. 1.15, as appearing in 440 Mass. 1338 (2004); Matter of Sharif, 459 Mass. 558, 564 (2011). See also Phillips v. Washington Legal Foundation, 524 U.S. 156, 164 (1998) ("[T]he principal held in IOLTA trust accounts is the 'private property' of the client"); Washington Legal Foundation v. Legal Foundation of Wash., 236 F.3d 1097, 1106 (9th Cir. 2001) ("[T]he money [in IOLTA accounts] belongs to the

fact in order to defeat the motion." Drakopoulos v. U.S. Bank Natl. Assn., 465 Mass. 775, 777-778 (2013) (quotations and citations omitted).

clients"); Kimble Mixer Co. vs. Hall, No. 2003 AP 01 0003, at 34 (Ohio Ct. App. Feb. 22, 2005) ("[F]unds deposited in an IOLTA account remain the property of the client"). That being the case, where the funds were distributed in accordance with the client's instructions,[6] the defendants cannot be found to have converted the funds, even insofar as they were used by the client to pay L & W's invoice.

Nor can the defendants be faulted for having Tobins's attorney transmit the funds to L & W's IOLTA account in the first place. There was nothing in the ZVI settlement, or, for that matter, in the Tobins settlement, that required the money to be paid to The Upper Crust's attorneys for the benefit of ZVI or to be held by them in an escrow account.[7] The Tobins settlement provided that the $250,000 was to be paid to The Upper Crust, and that it would be transmitted to an account to be designated by The Upper Crust. The ZVI settlement, in turn, simply provided that The Upper Crust pay the $250,000 to ZVI. While ZVI may have come to regret not having structured the

---

[6] Despite ZVI's argument to the contrary, it is evident from the record that there is no genuine dispute that The Upper Crust's CFO, Hurley, had the authority to provide direction as to the distribution of the $250,000.

[7] As the first judge remarked, there is nothing that "plausibly supports a meeting of the minds on an escrow agreement, and a promise to send a 'firm's wire info[rmation]' cannot reasonably be read otherwise."

mechanics of settlement differently, those were the terms to which the parties had agreed.[8]

c. Motion to strike alleged mediation statement. ZVI next argues that the first judge erred when, due to the provision in the mediation agreement barring the use of mediation communications for any purpose other than the mediation, she struck any reference in the amended complaint to Levy's alleged misrepresentation to the effect that he would pay the $250,000 to ZVI after it was received from Tobins. More particularly, ZVI argues that the judge erred in failing to recognize a fraud exception to the contractual provision.

Whether a fraud exception should be recognized in such circumstances is an undecided question in Massachusetts. We note, however, that our Legislature has recognized the importance of preserving the confidentiality of communications made during mediation, where those communications have been made in the presence of a qualified mediator.[9] See G. L. c. 233,

---

[8] As we conclude that the judge did not err in dismissing ZVI's claim for conversion, it follows that the judge did not err in dismissing ZVI's G. L. c. 93A claim insofar as it rests on the conversion claim.

[9] General Laws c. 233, § 23C, inserted by St. 1985, c. 325, provides in pertinent part: "Any communication made in the course of and relating to the subject matter of any mediation and which is made in the presence of such mediator by any participant, mediator or other person shall be a confidential communication and not subject to disclosure in any judicial or administrative proceeding; provided, however, that the

§ 23C. While the first judge did not explicitly so state in her decision on the motion to strike, it is implicit in her discussion of § 23C that she believed the statute did not apply, because, in addition to alleging that Levy's statement was made at mediation, ZVI also alleged that the statement was not made in the presence of the mediator.[10] Given the plain language of the statute, we are constrained to agree.

Nevertheless, the statute is instructive. It gives broad confidentiality protection to mediation communications, barring disclosure in any judicial or administrative proceeding, and creating only one express exception for the mediation of labor disputes. Significantly, the statute does not include an exception for fraud.[11] In light of that omission, we would be hard pressed to find that such an exception exists in the circumstances of this case, where there is a confidentiality

---

provisions of this section shall not apply to the mediation of labor disputes."

[10] As the first judge noted, "[t]his distinction is of more than passing interest because of the pleadings in this case. The original complaint . . . was verified, and did not identify whether the alleged representation by Levy with respect to handling the settlement funds was made within or without the presence of the mediator. . . . The Amended Complaint, which is not verified, adds the sentence . . . , 'Levy's representation occurred outside the presence of the mediator.'"

[11] It has been held, however, that, under some circumstances, there can be an at-issue waiver. See Bobick v. United States Fid. & Guar. Co., 439 Mass. 652, 658 n.11 (2003).

agreement,[12] negotiated between sophisticated business people with the assistance of legal counsel, that is even broader than § 23C. Indeed, were there to be a fraud exception to the parties' mediation confidentiality agreement when no such exception exists under the confidentiality provisions of § 23C, it could lead to the incongruous situation where two identical claims of fraud at mediation are alleged, but only one can go forward because the mediator was not within earshot at the moment when one of the communications was uttered.

We also note that, like § 23C, the most recent version of the Uniform Mediation Act (UMA), which has been adopted by eleven States and the District of Columbia,[13] does not include fraud among the recognized exceptions to the "privilege" protecting against the disclosure of "mediation communications." See Uniform Mediation Act (amended 2003), 7A (Part III) U.L.A. § 6 (2006). In fact, the comments accompanying the UMA reveal that a fraud exception was specifically considered and rejected. See id. at § 6 comment 5. Furthermore, while we have not been

---

[12] The parties' agreement provides that "all communications between and among the parties and their counsel, shall be confidential and shall not be used for any purpose other than for said mediation."

[13] See S.D. Codified Laws §§ 19-13A-1 to 19-13A-15 (2016) (UMA). See also Uniform Mediation Act (amended 2003), 7A (Part III) U.L.A. 73 (Supp. 2016) (noting Hawaii, Idaho, Illinois, Iowa, Nebraska, New Jersey, Ohio, Utah, Vermont, Washington, and District of Columbia have adopted UMA).

asked to do so here, we are not aware of any case where a court has created a fraud exception to a mediation confidentiality statute. We also are not aware of any case where a court has created such an exception to a mediation confidentiality agreement.

The closest case we have located is Facebook, Inc. v. Pacific N.W. Software, Inc., 640 F.3d 1034 (9th Cir. 2011), involving the highly-publicized dispute between Facebook founder, Mark Zuckerberg, and Cameron and Tyler Winklevoss. At issue in that case was whether the Winklevosses could rescind a mediated settlement on the ground that the plaintiffs had committed securities fraud by overstating the value of Facebook shares that would be transferred to the Winklevosses as part of the settlement. See id. at 1038. Because the parties had signed a mediation confidentiality agreement, providing that "[n]o aspect of the mediation shall be relied upon or introduced as evidence in any arbitral, judicial, or other proceeding," the court refused to allow the Winklevosses to support their securities fraud claims with evidence of what transpired at mediation. Id. at 1041. Of significance to the court was that the Winklevosses were sophisticated parties, who had been represented by counsel, and who had acquired enough information during the course of the litigation to know that the valuation

representations made by their opponents should be received with caution.  See id. at 1039.

The same factors are operative here.  The parties to the mediation agreement and the ZVI settlement were all business people, represented by counsel.  ZVI also had obtained sufficient information to know that any assurances of payment should be viewed cautiously.  ZVI knew of The Upper Crust's significant financial difficulties and that it was contemplating bankruptcy.  Moreover, in the collection action, ZVI had asserted claims of fraud and unfair and deceptive acts against The Upper Crust.

Furthermore, the mediation agreement merely precluded the parties from disclosing mediation communications; it did not bar the assertion of claims for fraud, based upon independent support.  There also is no suggestion that the mediation agreement itself was procured by fraud.  Under these circumstances, we agree with the first judge that the mediation agreement, and the confidentiality provision therein, are enforceable.  The judge did not abuse her discretion in striking from the amended complaint the statement Levy allegedly made during the mediation.

In any event, even if we were to assume that the first judge should not have allowed the motion to strike, we agree with her assessment that Levy's alleged statement, to the effect

that he would make sure that ZVI would be paid from the funds received from Tobins, does not amount to actionable fraud. Even if Levy had made such a statement, he was not personally guaranteeing payment; nor does ZVI suggest he was. Indeed, Levy cannot reasonably be understood as having taken on any personal legal obligations to ZVI. As previously discussed, he was not asked, and did not agree, to act as an escrow agent, and no such obligation was included in the settlement agreement. Furthermore, Levy was not a party to, and did not sign, the settlement agreement.

Finally, in light of the plain language of the ZVI settlement that The Upper Crust "shall pay to [ZVI] the sum of $250,000," ZVI cannot reasonably suggest that it relied on any assurance that it would be paid the Tobins funds.[14] See Masingill v. EMC Corp., 449 Mass. 532, 541 (2007). Thus, to the extent that ZVI's claims based on that alleged statement remain at issue,[15] they would fail as a matter of law even if the alleged statement should not have been struck.[16]

---

[14] An action for fraud or deceit requires proof of a "misrepresentation of a material fact, made to induce action, and reasonable reliance on the false statement to the detriment of the person relying." Hogan v. Riemer, 35 Mass. App. Ct. 360, 365 (1993).

[15] Six counts rested, in whole or in part, on the alleged mediation statement: aiding and abetting fraud (count V); misrepresentation (count VI); breach of alleged escrow agreement (count VII); breach of fiduciary duty (count VIII); conspiracy

d. Motion to compel. Lastly, ZVI challenges the first judge's denial of a motion to compel the production of various communications between the defendants and the clients they represented in the collection action, i.e., The Upper Crust and its principals. The judge found and ruled that the defendants had established that the communications were privileged under the "common interest/joint defense doctrine," see Hanover Ins. Co. v. Rapo & Jepsen Ins. Servs., Inc., 449 Mass. 609, 612-617 (2007), and that ZVI had not demonstrated a waiver exception within the scope recognized by Massachusetts law. Apparently, Higgins and Huggard agreed to waive any arguable personal privilege they had in the subject communications as part of the settlement of their own disputes with ZVI. Citing those waivers, as well as the alleged failure of The Upper Crust's

_____

(count X); and violations of G. L. c. 93A, § 11 (count XII). Four of those counts also were dismissed by the first judge for reasons independent of the alleged mediation statement, and ZVI has not challenged those reasons on appeal. As a result, the only counts at issue on appeal are what remained of the counts for misrepresentation (count VI) and violations of G. L. c. 93A, § 11 (count XII).

[16] The defendants also argue summarily that all of ZVI's claims fail because ZVI suffered no damages. Specifically, the defendants contend that the transfer of funds to ZVI was barred by an injunction in another Superior Court case. The defendants further contend that any payment would have been a voidable preference payment made within ninety days of The Upper Crust's bankruptcy filing, in violation of 11 U.S.C. § 547(b) (2012). We have been informed by the parties that these arguments are the subject of a separate contempt action. Because they are not factually developed in the record before us, we do not consider them.

bankruptcy trustee to take affirmative steps to maintain the confidentiality of the subject communications, ZVI claims that the judge's denial of its motion was in error.  We disagree.

As an initial matter, it is important to note what is not at issue in this appeal.  First, ZVI does not dispute that Higgins, Huggard, and The Upper Crust had jointly engaged Levy and L & W to represent them at the time of the subject communications.  Second, ZVI does not contest that, absent waiver, the subject communications are protected by the attorney-client privilege.  Third, ZVI does not claim that, again, absent waiver, The Upper Crust, acting through the trustee, has no legitimate right to assert the attorney-client privilege as to those communications.  Finally, ZVI acknowledges that the trustee has not expressly waived the attorney-client privilege as to the subject communications.  With these limitations in mind, we address ZVI's arguments.

ZVI first argues that the waivers by Higgins and Huggard preclude the application of the attorney-client privilege, because waiver by one or more, but not all jointly represented clients destroys the privilege for all of them.  As our appellate courts have yet to confront this issue, we must look elsewhere for guidance.  Notably, ZVI has not directed us to any authority holding that one client in a co-client relationship can waive the privilege for all clients as to third parties.

Meanwhile, there is a wealth of authority holding otherwise.

As ZVI acknowledges, there are many cases holding that, in circumstances where multiple clients are jointly represented by the same counsel, or in the analogous situation where multiple clients represented by separate counsel join together pursuant to a so-called "common interest" or "joint defense" agreement, all of the clients must waive the attorney-client privilege for a waiver to occur. See In re Teleglobe Communications Corp. v. BCE Inc., 493 F.3d 345, 363 (3d Cir. 2007) ("[W]aiving the joint-client privilege requires the consent of all joint clients"); United States v. BDO Seidman, LLP, 492 F.3d 806, 817 (7th Cir. 2007) ("[T]he privileged status of communications falling within the common interest doctrine cannot be waived without the consent of all of the parties"); John Morrell & Co. v. Local Union 304A of the United Food & Commercial Workers, AFL-CIO, 913 F.2d 544, 556 (8th Cir. 1990), cert. denied, 500 U.S. 905 (1991), quoting from Ohio-Sealy Mattress Mfg. Co. v. Kaplan, 90 F.R.D. 21, 29 (N.D. Ill. 1980) ("It is fundamental that 'the joint defense privilege cannot be waived without the consent of all parties to the defense'"); State v. Maxwell, Kan. App. 2d 62, 65 (1984) ("[W]here several persons employ an attorney and a third party seeks to have communications made

therein disclosed, none of the several persons -- not even a majority -- can waive this privilege").[17]

ZVI claims that these cases ignore the fact that when a client chooses to disclose a communication, the confidentiality that forms the "foundation" of the attorney-client privilege is destroyed, and, hence, the right to assert the privilege thereafter is lost. However, while this argument may have merit when there is only one client, it is not apt when a client who has agreed to be jointly represented by the same attorney(s) acts unilaterally and discloses a communication arising out of the joint attorney-client relationship. To the contrary, the concept of confidentiality would be undermined if such unilateral acts were condoned. As one Federal court has explained, requiring all clients to waive the privilege "is necessary to assure joint defense efforts are not inhibited or even precluded by the fear that a party to joint defense

---

[17] See also the Restatement (Third) of the Law: The Law Governing Lawyers § 75 (2000), which provides:

"(1) If two or more persons are jointly represented by the same lawyer in a matter, a communication of either co-client that otherwise qualifies as privileged under §§ 68-72 and relates to matters of common interest is privileged as against third persons, and any co-client may invoke the privilege, unless it has been waived by the client who made the communication.

"(2) Unless the co-clients have agreed otherwise, a communication described in Subsection (1) is not privileged as between the co-clients in a subsequent adverse proceeding between them."

communications may subsequently unilaterally waive the privileges of all participants, either purposefully in an effort to exonerate himself, or inadvert[e]ntly." Western Fuels Assn., Inc. v. Burlington N. R.R. Co., 102 F.R.D. 201, 203 (D. Wyo. 1984).

We agree with the prevailing authority, and discern no error in its application here by the first judge. Absent a waiver by the trustee on behalf of The Upper Crust, it is irrelevant whether Higgins and Huggard waived any personal privilege they may have held.

While acknowledging that the trustee did not expressly waive the attorney-client privilege, ZVI next argues that a waiver can be implied from what it suggests was the trustee's failure to react after ZVI induced Higgins and Huggard to disclose the communications. Again, however, the argument lacks merit. The record reflects that Levy and L & W acted repeatedly and successfully to protect the privilege of the subject communications throughout this action.[18] According to the trustee's affidavit submitted in support of those efforts, ZVI's counsel contacted him on several occasions asking him to waive the privilege on behalf of The Upper Curst, and he refused to do

---

[18] Levy and L & W successfully opposed ZVI's motion to compel production of the subject attorney-client communications. Then, when ZVI, despite that ruling, attached the communications to its summary judgment filing, Levy and L & W successfully moved to strike them.

so every time. It is not clear what more the trustee reasonably should have done. See Magnetar Technologies Corp. v. Six Flags Theme Park Inc., 886 F. Supp. 2d 466, 486 (D. Del. 2012) ("[A] waiver of a joint privilege is not accomplished by failing to take precautions to prevent disclosing documents in the custody of a former joint client or through delay in not immediately requesting their return"). Furthermore, given that the waiver of the privilege was not complete until the trustee consented, ZVI should not be permitted to use the premature disclosure of the communications by Higgins and Huggard -- a disclosure that ZVI induced -- as grounds for arguing that the trustee had impliedly waived the privilege. In sum, the first judge correctly concluded that there was no implied waiver.

3. Conclusion. The orders allowing Levy and L & W's motion to strike and denying ZVI's motion to compel are affirmed. The judgment entered January 5, 2015, and the final judgment as to the claims against Levy and L & W entered January 22, 2016, are affirmed.

So ordered.